UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 20-CV-1330

| | |
|---|---|
| Franklin Lopez; Yeriel Ramirez Torres; Samuel Martinez Lopez; and, all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> William P. Barr, United States Attorney General; Executive Office for Immigration Review; James McHenry, Director of the Executive Office for Immigration Review; Ryan R. Wood, Assistant Chief Immigration Judge for the Fort Snelling, Minnesota Immigration Court; Chad F. Wolf, Acting Secretary of the U.S. Department of Homeland Security; and the United States of America, <br><br> Defendants. | COMPLAINT |

## INTRODUCTION

1.      On May 17, 2018, the Attorney General issued *Matter of Castro-Tum*,
27 I. & N. Dec. 271 (A.G. 2018) and, in so doing, exceeded his statutory
authority and violated the Administrative Procedure Act by utilizing
his referral and review power, elucidated at 8 C.F.R. § 1003.1(h), to
improperly promulgate, through agency adjudication, a "rule" "of
general or particular applicability and future effect designed to

implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements" of the Executive Office for Immigration Review without complying with the notice-and-comment or publication requirements of 5 U.S.C. § 553. *See* 5 U.S.C. § 551(4).

2.    Although the Supreme Court has determined that an administrative agency, such as the Executive Office for Immigration Review, "is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion," the Supreme Court has also acknowledged that "there may be situations where the [agency]'s reliance on adjudication would amount to an abuse of discretion or a violation of [statute]." *N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294, 94 S. Ct. 1757, 1771, 40 L. Ed.2d 134 (1974).

3.    In *SEC v. Chenery Corp.*, the Supreme Court stated that the function of carrying out statutory directives "should be performed, as much as possible, through th[e] quasi-legislative promulgation of rules to be applied in the future." 332 U.S. 194, 202, 67 S. Ct. 1575, 1580, 91 L. Ed. 1995 (1947). Additionally, *Chenery* specified limited circumstances in which adjudication would be preferable to rulemaking:

> [P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards.

4.  In *N.L.R.B. v. Bell Aerospace*, the Supreme Court deferred to the agency's decision to act by adjudication, rather than by rulemaking, because the situation presented by *Bell Aerospace* involved circumstances which rendered adjudication preferable to rulemaking, as evidenced by the Court's statement that "[i]t is doubtful whether any generalized standard could be framed which would have more than marginal utility. The [agency] thus has reason to proceed with caution, developing its standards in a case-by-case manner . . . ." 416 U.S. at 294, 94 S. Ct. at 1771-72.

5.  In contrast to *Chenery* and *Bell Aerospace*, which both involved circumstances which involved application of specific facts to law and thus did not lend easily to rulemaking, *Matter of Castro-Tum* involved circumstances which the Attorney General and Executive Office for

Immigration Review could reasonably foresee and which are perfectly fitted for informal rulemaking.

6.   More specifically, *Castro-Tum* involved, and drastically limited, the Executive Office for Immigration Review's power to administratively close removal proceedings upon the motion of either party, which is a power that was long-exercised by the agency prior to the Attorney General's decision, and which was generally conceived to be within the agency's regulatory authority under 8 C.F.R. § 1003.10(b) (relating to the powers of immigration judges), 8 C.F.R. § 1003.1(d)(1)(ii) (relating to the powers of the Board of Immigration Appeals), 8 C.F.R. § 1240.1(a)(1)(iv) (allowing immigration judges to "take any other action consistent with applicable law and regulations as may be appropriate."), and 8 C.F.R. § 1003.9(b)(1) (vesting the Chief Immigration Judge with the authority to supervise, direct, and schedule the immigration judges in the conduct of removal hearings and the duties assigned to them and to "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities.").

7.   Prior to the issuance of the Attorney General's precedential decision in *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (2018), the Executive Office for Immigration Review routinely exercised its authority to

administratively close removal proceedings for a wide variety of

reasons and repeatedly affirmed and reaffirmed its power to do so

through a settled course of agency precedential agency adjudications.

*See, e.g.*, *Matter of Avetisyan*, 25 I. & N. Dec. 688, 688 (BIA 2012)

("Pursuant to the authority delegated by the Attorney General and the

responsibility to exercise that authority with independent judgment

and discretion, the Immigration Judges and the Board may

administratively close removal proceedings, even if a party opposes, if

it is otherwise appropriate under the circumstances."); *Matter of W-Y-*

*U-*, 27 I. & N. Dec. 17, 17 (BIA 2017) ("The primary consideration for

an Immigration Judge in evaluating whether to administratively close

or recalendar proceedings is whether the party opposing

administrative closure has provided a persuasive reason for the case to

proceed and be resolved on the merits.").

8.      In *Matter of Castro-Tum*, the Attorney General overruled prior binding

agency precedent which explicitly allowed for administrative closure.

*See* 27 I. & N. Dec. at 271. He further held that agency adjudicators in

the Executive Office for Immigration Review, consisting of

immigration judges and the Board of Immigration Appeals, "may only

administratively close a case where a previous regulation or a previous

judicially approved settlement expressly authorizes such an action."

*Id.* The Attorney General also held that "[n]either 8 C.F.R. § 1003.10(b) nor 8 C.F.R. § 1003.1(d)(1)(ii) confers the authority to grant administrative closure" despite longstanding agency precedent to the contrary. *Id.* In a similar vein, the Attorney General determined that 8 C.F.R. § 1240.1(a)(1) does not entail the authority to administratively close removal proceedings. *Id.* With an impressive eye to detail, the Attorney General additionally provided that "regulations empowering the Chief Immigration Judge and the Chairman of the Board to manage dockets—8 C.F.R. § 1003.9(b)(1) and 8 C.F.R. § 1003.1(a)(2)(i)(A)— grant no express authority to administratively close cases, and cannot reasonably be interpreted to implicitly delegate such authority." *Id.* In his final holding, the Attorney General provided that "Where a case has been administratively closed without the requisite authority, the immigration judge or the Board, as appropriate, shall recalendar the case on the motion of either party." *Id.*

9.     Thus, in a single agency adjudication, the Attorney General promulgated no less than seven agency statements of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy describing the organization,

procedure, or practice requirements of the Executive Office for Immigration Review. *See* 5 U.S.C. § 551(4); 5 U.S.C. § 553.

10. Illustratively, *Matter of Castro-Tum* consists of statements of general or particular applicability and future effect designed to implement, interpret, or prescribe the legal meaning the following regulations: 8 C.F.R. § 1003.1(a)(2)(i)(A), 8 C.F.R. § 1003.1(d)(1)(ii), 8 C.F.R. § 1003.9(b)(1), 8 C.F.R. § 1003.10(b), 8 C.F.R. § 1240.1(a)(1), and 8 C.F.R. § 1240.1(c).

11. Additionally, through the issuance of *Castro-Tum*, the Attorney General implicitly and substantively amended 8 C.F.R. § 212.7(e)(4)(iii) by fiat in a manner that deprives every individual in removal proceedings of the opportunity to apply for a provisional unlawful presence waiver under the statutory provision of 8 U.S.C. § 1182(a)(9)(B)(v). In so acting, the Attorney General appears to have adopted an objectively unreasonable interpretation of 8 U.S.C. § 1182(a)(9)(B)(v) by limiting the class of persons who may apply for a provisional unlawful presence waiver to those persons who are not in removal proceedings. This action appears to have infringed on the Secretary of Homeland Security's authority to be the sole interpreter of 8 U.S.C. § 1182(a)(9)(B)(v). *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 536-

01, 537 (Jan. 13, 2013) ("The Secretary is implementing this provisional unlawful presence waiver process under the broad authority to administer DHS and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority. The Secretary's discretionary authority to waive the ground of inadmissibility for unlawful presence can be found in INA section 212(a)(9)(B)(v), 8 U.S.C. § 1182(a)(9)(B)(v)."); *see also* 6 U.S.C. § 557.

12. By enacting 8 U.S.C. § 1182(a)(9)(B)(v), Congress created the provisional unlawful presence waiver and granted the Attorney General the sole discretion to waive grounds of inadmissibility arising under 8 U.S.C. § 1182(a)(9)(B)(i) (relating to 3- and 10- year periods of inadmissibility acquired by leaving the United States after acquiring a certain amount of unlawful presence in the United States).

13. It appears that the reference to Attorney General in 8 U.S.C. § 1182(a)(9)(B)(v) now means "Secretary of Homeland Security." *See* 6 U.S.C. § 557; *see also Silva v. United States*, 866 F.3d 938, 940 n.2 (8th Cir. 2017) (In light of legislation transferring functions of the former Immigration and Naturalization Service to the Department of Homeland Security, 6 U.S.C. §§ 202, 251, 557, the statutory reference

to "Attorney General" now means the Secretary of the Department of Homeland Security.") (citations omitted).

14. The Secretary of Homeland Security, then amended 8 C.F.R. § 212.7 which provides, among other things, who is eligible and ineligible to apply for the provisional unlawful presence waiver made available by 8 U.S.C. § 1182(a)(9)(B)(v).

15. 8 C.F.R. § 212.7(e)(3) lists persons who are eligible to apply for a provisional unlawful presence waiver, but this subsection is subject to 8 C.F.R. § 212.7(e)(4) which lists persons who are ineligible to apply for a provisional unlawful presence waiver.

16. 8 C.F.R. § 212.7(e)(4)(iii) provides that any noncitizen who "is in removal proceedings, in which no final order has been entered" is ineligible to apply for a provisional unlawful presence waiver "*unless the removal proceedings are administratively closed and have not been recalendared at the time of filing the application for a provisional unlawful presence waiver*." (emphasis added).

17. Thus, when the Attorney General issued *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018), and held that the Executive Office for Immigration Review lacks the authority to administratively close a case unless "a previous regulation or a previously judicially approved settlement expressly authorizes such an action," and further held that

8 C.F.R. § 212.7(e)(4)(iii) does not expressly authorize administrative closure, **the Attorney General implicitly amended 8 C.F.R. § 212.7(e)(4)(iii) by implicitly deleting the "unless the removal proceedings are administratively closed . . . " language and thus exceeded his statutory authority** by adopting an objectively unreasonable and ultra vires interpretation of 8 U.S.C. § 1182(a)(9)(B)(v) not entitled *Chevron* deference. (emphasis added).

18.   The plain text of the initial regulatory enactment, which gave life to the provisional unlawful presence waiver, clearly evidences that the provisional unlawful presence waiver is intended to be available to persons in removal proceedings. *See* 78 Fed. Reg. 536-01, 538 (Jan. 13, 2013), which provides (emphasis added):

> **DHS initially proposed excluding all [noncitizen]s who were in removal proceedings from the provisional unlawful presence waiver process**, except those whose: (1) Removal proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; or (3) removal proceedings had been administratively closed but subsequently were reopened to grant voluntary departure. See 77 FR at 19922. **In this final rule, DHS . . . has decided to allow [noncitizen]s in removal proceedings to participate in this new provisional unlawful presence waiver process** if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I-601A. See section 212.7(e)(4)(v). [Noncitizen]s whose removal proceedings are terminated or dismissed are covered in the general population of [noncitizen]s who are eligible to apply for a provisional unlawful presence

waiver. [Noncitizen]s who have had their NTAs cancelled by ICE are also covered in the general population of [noncitizen]s who are eligible to apply for a provisional unlawful presence waiver, since their removal proceedings were never initiated through filing of an NTA with EOIR.

19.    **Plaintiffs seek judicial review to determine:**

**(1)** Whether the Attorney General violated the Administrative Procedure Act by promulgating a legislative rule through an agency adjudication that did not comply with the notice-and-comment and related requirements of 5 U.S.C. § 553;

**(2)** Whether the Attorney General abused his discretion by promulgating the rules expounded by *Matter of Castro-Tum* through an agency adjudication rather than through the informal rulemaking process;

**(3)** Whether the Attorney General acted in excess of statutory authority by acting in a manner that interprets the benefits provided by 8 U.S.C. § 1182(a)(9)(B)(v) to be wholly unavailable to individuals in removal proceedings;

**(4)** Whether the Attorney General's interpretation of 8 U.S.C. § 1182(a)(9)(B)(v) is reasonable or otherwise entitled to deference;

**(5)** Whether the Attorney General's interpretations of relevant regulations—including: 8 C.F.R. § 1003.9(b); 8 C.F.R. § 1003.1(a)(2)(i)(A); 8 C.F.R. § 1003.10(b); 8 C.F.R. § 1003.1(d)(1)(ii); and

8 C.F.R. § 1240.1—are reasonable and thus entitled to deference;

**(6)** Whether the rationale provided by the Attorney General in *Castro-Tum* is inadequate or improper;

**(7)** Whether 8 C.F.R. § 1003.1(h)(1)(i) exceeds the Attorney General's authority under 8 U.S.C. § 1103(g);

**(8)** Whether the Executive Office for Immigration Review has adopted an unlawful pattern or practice of abusing their discretion by refusing to exercise discretion when the exercise of discretion is called for by regulation(s) and the facts of the case;

**(9)** Whether immigration judges within the Executive Office for Immigration Review have adopted an unlawful pattern or practice of impermissibly circumscribing their own discretion to administratively close cases for individuals who are otherwise eligible to apply for and who wish to apply for a provisional unlawful presence waiver;

**(10)** Whether the Executive Office for Immigration Review, and subcomponents thereof, have adopted an unlawful pattern or practice of disregarding and disclaiming their regulatory authority—granted to them by 8 C.F.R. § 1003.9(b)(3); 8 C.F.R. § 1003.1(a)(2)(i)(C); 8 C.F.R. § 1003.10(b); 8 C.F.R. § 1240.1(a)(1)(iv); 8 C.F.R. § 1240.6; and 8 C.F.R. § 212.7(e)(4)(iii)—to administratively close proceedings so that otherwise eligible individuals may apply for a provisional unlawful presence

waiver;

**(11)** Whether the Secretary of Homeland Security violated the Administrative Procedure Act by adopting a binding policy (constituting a de facto regulation) which functionally amended 8 C.F.R. § 212.7(e)(4)(iii) to prevent all individuals in removal proceedings from applying for a provisional unlawful presence waiver without complying with the rulemaking or adjudication procedures of 5 U.S.C. § 553 or 5 U.S.C. § 554;

**(12)** Whether Secretary of Homeland Security has adopted an unlawful pattern or practice of discriminating against, and denying equal protection of the law to, individuals in removal proceedings who wish to apply for provisional unlawful presence waivers and who would be eligible to apply for such waivers if only their removal proceedings were terminated or administratively closed;

**(13)** Whether Secretary of Homeland Security's refusal to publish a proposed regulation to amend 8 C.F.R. § 212.7(e)(4)(iii) for a period of more than two years since the issuance of *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018) constitutes agency action unlawfully withheld or unreasonably delayed under the Administrative Procedure Act; and,

**(14)** Whether the Secretary of Homeland Security's current

interpretation of 8 U.S.C. § 1182(a)(9)(B)(v)—an interpretation which currently prevents all individuals in removal proceedings from applying for provisional unlawful presence waivers—is contrary to constitutional right (equal protection) or otherwise short of statutory right (i.e., did Congress intend for the waiver of 8 U.S.C. § 1182(a)(9)(B)(v) to be available to persons with final removal orders but not to individuals without final orders who are in removal proceedings).

## **PARTIES**

### **Plaintiff 1: Franklin Lopez**

20.  Plaintiff Franklin Lopez is a native and citizen of Honduras; he is not a national or citizen of the United States.

21.  He is present in the United States and is married to a U.S. citizen.

22.  Mr. Lopez has two U.S. citizen children in common with his wife and he is also the stepfather to and caretaker of three additional U.S. citizen children that his wife has from a previous relationship.

23.  Mr. Lopez is the named beneficiary of an approved immediate relative petition (Form I-130) and he is currently in immigration removal proceedings which have not been administratively closed before the Fort Snelling, Minnesota immigration court (a component of the Executive Office for Immigration Review, or "EOIR").

24.    Mr. Lopez has provided biometrics to the U.S. Citizenship &
       Immigration Service ("USCIS") at a location in the United States
       designated by USCIS and remains willing to continue doing so if
       additional requests are made.

25.    Mr. Lopez is currently inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i).

26.    If Mr. Lopez departs the United States to attend an immigrant visa
       interview, he will only be inadmissible under 8 U.S.C. §
       1182(a)(9)(B)(i).

27.    Mr. Lopez has a case pending with the Department of State based on
       an approved immigrant visa petition, for which the Department of
       State immigrant visa processing fee has been paid.

28.    Mr. Lopez will depart the United States to obtain the immigrant visa
       if he is allowed to apply for a provisional unlawful presence waiver if
       his application for the waiver is granted.

29.    Mr. Lopez can show that his U.S. citizen wife will experience extreme
       hardship if his application for a provisional unlawful presence waiver
       is not approved and that he otherwise meets the requirements for a
       waiver provided in 8 U.S.C. § 1182(a)(9)(B)(v) and 8 C.F.R. § 212.7.

30.    Mr. Lopez is above the age of 17 and is not subject to an
       administratively final order of removal, deportation, or exclusion
       under any provision of law.

31.   Neither CBP nor ICE has ever reinstated any prior order of removal under INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) because Mr. Lopez has never received a prior order of removal capable of being reinstated.

32.   Mr. Lopez does not have any pending application with USCIS for lawful permanent residence status.

33.   Mr. Lopez has filed a motion to administratively close his removal proceedings which was denied by an immigration judge on December 6, 2019.

**Plaintiff 2: Yeriel Ramirez Torres**

34.   Plaintiff Yeriel Ramirez Torres is a native and citizen of Mexico; he is not a national or citizen of the United States.

35.   He is present in the United States and is married to a U.S. citizen.

36.   Mr. Ramirez Torres has two U.S. citizen children in common with his wife.

37.   Mr. Ramirez Torres is the named beneficiary of an approved immediate relative petition (Form I-130) and he is currently in immigration removal proceedings which have not been administratively closed before the Fort Snelling, Minnesota immigration court.

38.   Mr. Ramirez Torres has provided biometrics to USCIS at a location in the United States designated by USCIS and remains willing to continue doing so if additional requests are made.

39.   Mr. Ramirez Torres is currently inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i).

40.   If Mr. Ramirez Torres departs the United States to attend an immigrant visa interview, he will only be inadmissible under 8 U.S.C. § 1182(a)(9)(B)(i).

41.   Mr. Ramirez Torres has a case pending with the Department of State based on an approved immigrant visa petition, for which the Department of State immigrant visa processing fee has been paid.

42.   Mr. Ramirez Torres will depart the United States to obtain the immigrant visa if he is allowed to apply for a provisional unlawful presence waiver if his application for the waiver is granted.

43.   Mr. Ramirez Torres can show that his U.S. citizen wife will experience extreme hardship if his application for a provisional unlawful presence waiver is not approved and that he otherwise meets the requirements for a waiver provided in 8 U.S.C. § 1182(a)(9)(B)(v) and 8 C.F.R. § 212.7.

44. Mr. Ramirez Torres is above the age of 17 and is not subject to an administratively final order of removal, deportation, or exclusion under any provision of law.

45. Neither CBP nor ICE has ever reinstated any prior order of removal under 8 U.S.C. § 1231(a)(5) because Mr. Ramirez Torres has never received a prior order of removal capable of being reinstated.

46. Mr. Ramirez Torres does not have any pending application with USCIS for lawful permanent residence status.

47. Mr. Ramirez Torres has filed a motion to administratively close his removal proceedings which was denied by an immigration judge on October 22, 2019.

## Plaintiff 3: Samuel Martinez Lopez

48. Plaintiff Samuel Martinez Lopez is a native and citizen of El Salvador; he is not a national or citizen of the United States.

49. He is present in the United States and is married to a U.S. citizen.

50. Mr. Martinez Lopez has two U.S. citizen children in common with his wife; he also has two additional U.S. citizen children from a prior relationship; Mr. Martinez Lopez is the stepfather to and partial caretaker of four additional U.S. citizen children that his wife has from previous relationships.

51.   Mr. Martinez Lopez is the named beneficiary of an approved

      immediate relative petition (Form I-130) and he is currently in

      immigration removal proceedings which have not been

      administratively closed before the Fort Snelling, Minnesota

      immigration court.

52.   Mr. Martinez Lopez has provided biometrics to USCIS at a location in

      the United States designated by USCIS and remains willing to

      continue doing so if additional requests are made.

53.   Mr. Martinez Lopez is currently inadmissible under 8 U.S.C. §

      1182(a)(6)(A)(i).

54.   If Mr. Martinez Lopez departs the United States to attend an

      immigrant visa interview, he will only be inadmissible under 8 U.S.C.

      § 1182(a)(9)(B)(i).

55.   Mr. Martinez Lopez has a case pending with the Department of State

      based on an approved immigrant visa petition, for which the

      Department of State immigrant visa processing fee has been paid.

56.   Mr. Martinez Lopez will depart the United States to obtain the

      immigrant visa if he is allowed to apply for a provisional unlawful

      presence waiver if his application for the waiver is granted.

57.   Mr. Martinez Lopez can show that his U.S. citizen wife will

      experience extreme hardship if his application for a provisional

unlawful presence waiver is not approved and that he otherwise

meets the requirements for a waiver provided in 8 U.S.C. §

1182(a)(9)(B)(v) and 8 C.F.R. § 212.7.

58.   Mr. Martinez Lopez is above the age of 17 and is not subject to an

administratively final order of removal, deportation, or exclusion

under any provision of law.

59.   Neither CBP nor ICE has ever reinstated any prior order of removal

under 8 U.S.C. § 1231(a)(5) because Mr. Martinez Lopez has never

received a prior order of removal capable of being reinstated.

60.   Mr. Martinez Lopez does not have any pending application with

USCIS for lawful permanent residence status.

61.   Mr. Martinez Lopez has filed a motion to administratively close his

removal proceedings which was denied by an immigration judge on

December 13, 2019.

## Unnamed Plaintiffs: All Others Similarly Situated

62.   Each unnamed but similarly situated Plaintiff is not a national or

citizen of the United States.

63.   Each unnamed but similarly situated Plaintiff is the named

beneficiary of an approved immediate relative petition (Form I-130).

64.   Each unnamed but similarly situated Plaintiff is currently in immigration removal proceedings before the Fort Snelling, Minnesota immigration court.

65.   Each unnamed but similarly situated Plaintiff is present in the United States.

66.   Each unnamed but similarly situated Plaintiff has or will provide biometrics to USCIS at a location in the United States designated by USCIS.

67.   Each unnamed but similarly situated Plaintiff is currently inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i).

68.   Each unnamed but similarly situated Plaintiff will only be inadmissible under 8 U.S.C. § 1182(a)(9)(B)(i) upon departure from the United States at the time of their immigrant visa interview.

69.   Each unnamed but similarly situated Plaintiff has a case pending with the Department of State based on an approved immigrant visa petition, for which the Department of State immigrant visa processing fee has been paid.

70.   Each unnamed but similarly situated Plaintiff will depart the United States to obtain an immigrant visa.

71.  Each unnamed but similarly situated Plaintiff meets the
     requirements for a waiver provided in 8 U.S.C. § 1182(a)(9)(B)(v) and
     8 C.F.R. § 212.7.

72.  Each unnamed but similarly situated Plaintiff is age 17 or older.

73.  Each unnamed but similarly situated Plaintiff is in removal
     proceedings, in which no final order has been entered, and the
     removal proceedings are not administratively closed.

74.  Each unnamed but similarly situated Plaintiff is not subject to an
     administratively final order of removal, deportation, or exclusion
     under any provision of law, unless the individual has already filed
     and USCIS has already granted, before the individual applies for a
     provisional unlawful presence waiver under 8 C.F.R. § 212.7(e), an
     application for consent to reapply for admission under 8 U.S.C. §
     1182(a)(9)(A)(iii) and 8 C.F.R. § 212.2(j).

75.  Each unnamed but similarly situated Plaintiff does not have a
     pending application with USCIS for lawful permanent resident
     status.

76.  Each unnamed but similarly situated Plaintiff has not been subjected
     to and is not subject to a reinstated prior order of removal under 8
     U.S.C. § 1231(a)(5) after service of a notice under 8 C.F.R. § 241.8
     either before the filing of the provisional unlawful presence waiver

application or while the provisional unlawful presence waiver

application is pending.

## **Defendant 1: William P. Barr, Attorney General of the United States**

77.     Defendant William P. Barr is the United States Attorney General and

has "such authorities and functions under [the INA] and all other laws

relating to the immigration and naturalization of [noncitizen]s as were

exercised by the Executive Office for Immigration Review, or by the

Attorney General with respect to the Executive Office for Immigration

Review, on the day before the effective date of [The Homeland Security

Act] of 2002." 8 U.S.C. § 1103(g)(1).

78.     The Attorney General is responsible for establishing "such regulations,

prescribe such forms of bonds, reports, entries, and other papers, issue

such instructions, review such administrative determinations in

immigration proceedings, delegate such authority, and perform such

other acts as the Attorney General determines to be necessary for

carrying out [8 U.S.C. § 1103(g)(1)]." 8 U.S.C. § 1103(g)(2).

79.     The Attorney General provides direction and regulation for the

Department of Justice's Executive Office for Immigration Review

component. 6 U.S.C. § 521.

80.     The Attorney General holds the power to direct the Board of

Immigration Appeals (a component of EOIR) to, *inter alia*, "refer to the

Attorney General for review of [the Board's] decision all cases that: . . . [t]he Attorney General directs to the Board to refer to him." 8 C.F.R. § 1003.1(h)(1)(i).

81.  When the Attorney General uses his certification power (also known as his "referral and review" power), provided by 8 C.F.R. § 1003.1(h)(1), to issue an immigration-related decision, the Attorney General's "determination and ruling . . . with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1), (g).

82.  It is unclear whether two of the regulatory subsections promulgated by the Attorney General which govern the Executive Office for Immigration Review—specifically, 8 C.F.R. § 1003.1(h)(1)(i) (allowing the Attorney General to command the Board of Immigration Appeals to refer a case to the Attorney General for review) and 8 C.F.R. § 1003.1(h)(1)(iii) (allowing the Secretary of Homeland Security, or specific officials of the Department of Homeland Security, to refer cases to the Attorney General for review)—constitute reasonable interpretations of 8 U.S.C. § 1103(g); it appears that these regulatory provisions exceed the Attorney General's statutory authority under 8 U.S.C. § 1103(g) and concurrently violate 5 U.S.C. § 557(d)(1).

83.  Because the Attorney General is given absolute authority over discretionary decisions and rulemaking for the Executive Office for

Immigration Review, and because the Attorney General has delegated his discretion related to a wide variety of immigration-related matters to the Executive Office for Immigration Review, and then has subsequently redelegated this authority to immigration judges and the Board of Immigration Appeals, the Attorney General is responsible for adjudication of motions to administratively close proceedings that are filed with the various subcomponents of the Executive Office for Immigration Review.

84.   Defendant William P. Barr is sued in his official capacity as the United States Attorney General.

### **Defendant 2: Executive Office for Immigration Review**

85.   Defendant Executive Office for Immigration Review ("EOIR") is a component of the Department of Justice and is the executive administrative agency of the United States that is responsible for adjudication of motions to administratively close proceedings that are filed in relation to immigration removal proceedings. *See* 6 U.S.C. § 521; 8 U.S.C. § 1103(g)(1); 8 C.F.R. § 1003.0.

86.   The Executive Office for Immigration Review includes the Board of Immigration Appeals, the Office of the Chief Immigration Judge, the Office of the Chief Administrative Hearing Officer, the Office of Policy, the Office of the General Counsel, and such other components and staff

as the Attorney General or Director of the Executive Office for
Immigration Review may provide. 8 C.F.R. § 1003.0(a).

87.   Subject to the direction and supervision of the Attorney General, the
Executive Office for Immigration Review is responsible for adjudication
of motions to administratively close proceedings that are filed with the
various subcomponents of the Executive Office for Immigration Review.

### Defendant 3: James McHenry, Director of EOIR

88.   Defendant James McHenry is the Director of the Executive Office for
Immigration Review; he has a variety of powers delegated to him
from the Attorney General through 8 C.F.R. § 1003.0(b) and limited
only by 8 C.F.R. § 1003.0(c).

89.   8 C.F.R. § 1003.0(b)(1)(ii) (emphasis added) explicitly provides that
the Director of EOIR:

> [S]hall have the authority to:
>
> . . .
>
> **(ii)** Direct the conduct of all EOIR employees [including
> immigration judges] to ensure the **efficient disposition**
> of all pending cases, **including the power, in <u>his</u>
> discretion** [and not in the Attorney General's discretion],
> to set priorities or time frames for the resolution of cases;
> **to direct that the adjudication of certain cases be
> deferred [i.e., administratively closed];** . . . and
> **otherwise manage the docket of matters to be
> decided by the Board [and] immigration judges** . . .

90. Additionally, binding regulations also provide that the Director of
   EOIR:

> [S]hall have the authority to: . . . **(iii)** Provide for
> **appropriate administrative coordination** with the
> other components of the Department of Justice [and] with
> the Department of Homeland Security.

   8 C.F.R. § 1003.0(b)(1)(iii) (emphasis added).

91. Subject to the direction and supervision of the Attorney General, the
   Director of EOIR, through his delegation of power to immigration
   judges and the Board of Immigration Appeals, is responsible for
   adjudication of motions to administratively close proceedings that are
   filed with the various subcomponents of the Executive Office for
   Immigration Review.

## Defendant 4: Ryan R. Wood, Assistant Chief Immigration Judge

92. Defendant Ryan R. Wood is the Assistant Chief Immigration Judge
   ("ACIJ") for the Fort Snelling, Minnesota immigration court; ACIJ
   Wood has been delegated certain authorities by the Director of EOIR
   to assist the Chief Immigration Judge in the management of the
   Office of the Chief Immigration Judge. *See* 8 C.F.R. § 1003.9(a). ACIJ
   Wood is sued in his official capacity only.

93. Subject to the direction and supervision of the Attorney General, the
   Director of EOIR, and the Chief Immigration Judge, ACIJ Wood has

the authority to direct the conduct of employees of the Fort Snelling, Minnesota immigration court to ensure the efficient disposition of all pending cases, including the power, in his limited discretion, to set priorities or time frames for the resolution of cases, **to direct that the adjudication of certain cases be deferred**, to regulate the assignment of immigration judges to cases, and to otherwise manage the docket of matters to be decided by the immigration judge who adjudicate cases in the immigration court located in Fort Snelling, Minnesota. *See* 8 C.F.R. § 1003.9(b)(3); *see also* 8 C.F.R. § 1003.10(b).

94.  Regulations provide that ACIJ Wood "shall have no authority to direct the result of an adjudication assigned to another immigration judge . . . ." 8 C.F.R. § 1003.9(c).

95.  Subject to the direction and supervision of the Attorney General, the Director of EOIR, and the Chief Immigration Judge, ACIJ Wood is responsible for overseeing the adjudication of motions to administratively close proceedings that are filed with the immigration court in Fort Snelling, Minnesota.

## Defendant 5: Chad F. Wolf, Acting Secretary of DHS

96.  Defendant Chad F. Wolf is the current Acting Secretary of the United States Department of Homeland Security and is sued in his official capacity only.

97.  Defendant Wolf is charged with the administration and enforcement
     of the INA and all other laws relating to the immigration and
     naturalization of noncitizens, except insofar as the INA or such laws
     relate to the powers, functions, and duties conferred upon the
     President, Attorney General, the Secretary of State, the officers of
     the Department of State, or diplomatic or consular officers. 8 U.S.C. §
     1103(a)(1); 8 C.F.R. § 2.1.

98.  Defendant Wolf has been commanded by Congress to "establish such
     regulations; prescribe such forms of bond, reports, entries, and other
     papers; issue such instructions; and perform such other acts as he
     deems necessary for carrying out his authority under the provisions
     of [the INA]." 8 U.S.C. § 1103(a)(3).

99.  The Secretary of Homeland Security "may **require** any employee of
     the Service **or the Department of Justice** to perform or exercise
     any of the powers, privileges, or duties conferred or imposed by this
     chapter or regulations issued thereunder upon any other employee of
     the Service." 8 U.S.C. § 1103(a)(4) (emphasis added). As such, it
     appears that, by promulgating 8 C.F.R. § 212.7(e)(4)(iii), the
     Secretary of Homeland Security may compel immigration judges to
     administratively close cases so that an otherwise eligible noncitizen

in removal proceedings may apply for a provisional unlawful presence waiver.

100.   The Secretary of Homeland Security has delegated the sole authority to adjudicate applications for provisional unlawful presence waivers, authorized by 8 U.S.C. § 1182(a)(9)(B)(v) and 8 C.F.R. § 212.7, to the United States Citizenship & Immigration Service ("USCIS"), which is a component of the Department of Homeland Security ("DHS"). *See* 8 C.F.R. § 212.7(e)(1).

101.   Although 8 U.S.C. § 1182(a)(9)(B)(v) provides that "[t]he Attorney General has sole discretion to waive [8 U.S.C. § 1182(a)(9)(B)(i)]," 6 U.S.C. § 557 and *Silva v. United States*, 866 F.3d at 940 n.2 (8th Cir. 2017), together, provide that the statutory reference to "Attorney General," for purposes of 8 U.S.C. § 1182(a)(9)(B)(v), actually means "Secretary of Homeland Security."

102.   Thus, the Secretary of Homeland Security (i.e., Defendant Wolf) has the sole discretion to interpret 8 U.S.C. § 1182(a)(9)(B)(v).

103.   Pursuant to the Secretary's authority to establish regulations, the Secretary of Homeland Security established and amended 8 C.F.R. § 212.7(e) and, in so doing, interpreted 8 U.S.C. § 1182(a)(9)(B)(v) in a manner that was intended to allow for persons in removal proceedings to apply for provisional unlawful presence waivers. *See* 78 Fed. Reg.

536-01, 537-38 (Jan. 13, 2013). However, as a result of the Attorney General's issuance of *Matter of Castro-Tum*, individuals in removal proceedings are no longer eligible to apply for provisional unlawful presence waivers.

104. The Secretary of Homeland Security has not made any attempt to amend 8 C.F.R. § 212.7(e)(4)(iii) in response to the Attorney General's issuance of *Matter of Castro-Tum*.

105. Moreover, the Secretary has instructed his subordinates to reject applications for provisional unlawful presence waivers filed by individuals who are in removal proceedings that are not administratively closed even though it is no longer possible for Plaintiffs and similarly situated individuals in removal proceedings to administratively close their removal proceedings.

106. By refusing to take any material step(s) to amend 8 C.F.R. § 212.7(e)(4)(iii) after the issuance of *Castro-Tum*, and by enacting a binding policy of rejecting applications for provisional unlawful presence waivers filed by individuals who are only ineligible to file such applications under 8 C.F.R. § 212.7(e)(4)(iii), the Secretary of Homeland Security appears to have substantively amended 8 C.F.R. § 212.7(e)(4)(iii) by effectively writing-out and making superfluous the regulation's "unless the removal proceedings are administratively

closed and have not been recalendared" language in a manner that did not comply with the notice-and-comment or publication requirements of 5 U.S.C. § 553 and without announcing any rules through adjudication in accordance with 5 U.S.C. § 554.

107.   The Secretary's newly adopted and unannounced interpretation of 8 U.S.C. § 1182(a)(9)(B)(v) is objectively unreasonable because the Secretary's current interpretation of this statute allows for individuals who have been ordered removed to apply for provisional unlawful presence waivers (so long as the individual previously ordered removed first applies for and is granted consent to reapply for admission under 8 U.S.C. § 1182(a)(9)(A)(iii) and 8 C.F.R. § 212.2(j)), but does not allow for individuals who have not been ordered removed to apply for provisional unlawful presence waivers. This distinction is the definition of arbitrary and capricious.

## Defendant 6: United States of America

108.   Defendant United States of America is ultimately responsible for the adjudication of motions to administratively close proceedings which are filed with the Executive Office for Immigration Review.

109.   The United States of America is also ultimately responsible for the Attorney General's issuance of *Matter of Castro-Tum* and the

Secretary of Homeland Security's promulgation and interpretation of

8 U.S.C. § 212.7(e)(4)(iii).

110.   Although the United States of America may or may not constitute an

"agency" within the meaning of the Administrative Procedure Act, it

is being named in this suit in order to foreclose any attempts by

Defendants to "deftly transfer blame and responsibility from one

governmental entity to another." *See Paunescu v. I.N.S.*, 76 F.

Supp.2d 896, 903 n.2 (N.D. Ill. 1999) ("Throughout this case,

defendants have tried to deftly transfer blame and responsibility

from one governmental entity to another. The court will not allow

defendants to play this shell game. The INS, the FBI, and the State

Department are all arms of the United States of America, a

defendant in the instant case.").

## **JURISDICTION**

111.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction); 28 U.S.C. § 1346 (relating to actions where the

United States is a defendant); 28 U.S.C § 1361 (jurisdiction over actions

for mandamus); 28 U.S.C. § 1367 (supplemental jurisdiction); and 28

U.S.C. § 1651 (the All Writs Act).

112.   The Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., applies to

this lawsuit.

113.  The challenged agency actions are all made reviewable by statute or

       otherwise constitute final agency action for which there is no other

       adequate remedy in a court.

## VENUE

114.  Venue properly lies in the District of Minnesota pursuant to 28 U.S.C. §

       1391 because the United States government is a defendant; a

       substantial part of the events giving rise to this claim occurred in this

       district; one or more Plaintiffs reside in this district; and no real

       property is involved in this action.

## LEGAL BACKGROUND

115.  The provisional unlawful presence waiver (Form I-601A) was made

       available for the first time on March 4, 2013 for immigrant visa

       applicants who can show that the applicant's extended presence

       outside of the United States will result in extreme hardship to their

       U.S. citizen spouse or parent. *See* Provisional Unlawful Presence

       Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed.

       Reg. 536-01 (Jan. 3, 2013).

116.  The enacting regulation included a Supplementary Information section

       which provides that the sole reason that immigration judges and the

       Executive Office for Immigration Review were not given the ability to

       adjudicate provisional unlawful presence waiver applications was

because "DHS determined that it would be more efficient and appropriate to have Form I-601A waivers [i.e., provisional unlawful presence waiver applications] centralized and adjudicated by one agency, USCIS, especially given the intended streamlined nature of the process . . . ." 78 Fed. Reg. 536-01, 537 (Jan. 13, 2013). This language makes clear that DHS intended for individuals in removal proceedings to be able to apply for provisional unlawful presence waivers, and that the only reason such power was not granted to EOIR was because the Secretary presumed that EOIR would continue to allow administrative closure of removal proceedings if an individual in removal proceedings intended to apply for a provisional unlawful presence waiver.

117. The regulation which created the provisional unlawful presence waiver also explicitly detailed that "DHS initially proposed excluding all [noncitizens] who were in removal proceedings from the provisional unlawful presence, **except those** whose: (1) [r]emoval proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; or (3) removal proceedings had been administratively closed but were subsequently reopened to grant voluntary departure." 78 Fed. Reg. 536-01, 538 (Jan. 13, 2013) (citing 77 Fed. Reg. at 19922). However, rather than adopting this restrictive

language, DHS instead "decided to allow [noncitizens] in removal proceedings to participate in this new provisional unlawful presence waiver process if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I-601A." 78 Fed. Reg. 536-01, 538 (Jan. 13, 2013).

118.   By providing that individuals are eligible to file for a provisional unlawful presence waiver so long as their removal proceedings are administratively closed, the Secretary of Homeland Security reasonably interpreted 8 U.S.C. § 1182(a)(9)(B)(v) in a manner that allows for persons in removal proceedings to apply for a provisional unlawful presence waiver. Moreover, a person remains eligible for a provisional unlawful presence waiver *even if* their removal proceedings are recalendared before the application is adjudicated *so long as* the application was received before proceedings were recalendared, DHS further evidenced a clear intent to allow individuals in removal proceedings to apply for and benefit from provisional unlawful presence waivers. *See* 8 C.F.R. § 212.7(e)(4)(iii).

119.   In August 2016, the provisional unlawful presence waiver (Form I-601A) was expanded to more applicants, allowing any beneficiary who can show hardship to a U.S. citizen or permanent resident spouse or parent.

120.   The provisional unlawful presence waiver is a process by which individuals who are currently in the United States and who will be applying for an immigrant visa at a U.S. consulate abroad, and whose only inadmissibility issue is unlawful presence under 8 U.S.C. § 1182(a)(9)(B)(i), may apply for the waiver of inadmissibility before they leave the United States. Generally, the provisional unlawful presence waiver process helps people who have been living in the United States with their family without status, who are ineligible to adjust their status to that of a lawful permanent resident, and who raise no other inadmissibility issues. *See* 8 U.S.C. § 1182(a)(9)(B)(v); 8 C.F.R. § 212.7(e)(3), (4); 78 Fed. Reg. 536-01, 537-38 (Jan. 13, 2013); Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 81 Fed. Reg. 50244-01, 50244-45 (July 29, 2016).

121.   Before the provisional waiver process began in 2013, individuals had to leave the United States to attend their consular interviews and could only seek a waiver of inadmissibility after the consular officer made a formal finding of unlawful presence inadmissibility. 78 Fed. Reg. 536-01, 536 (Jan. 13, 2013). These individuals were forced to stay outside the United States for many months, far from family, work, and community ties, while waiting for adjudication of their waiver for unlawful presence. *Id.* If the waiver were ultimately denied, the

immigrant visa applicant would be stuck outside the country with no immediate way to return legally. *Id.* Lengthy separation and uncertainty in the process meant that, for many families, this pathway to legal status was too risky to undertake. *Id.* The Department of Homeland Security acknowledged as much, stating, "As a result of the often lengthy processing times and uncertainty about whether they qualify for a waiver of the unlawful presence inadmissibility grounds, many immediate relatives who may qualify for an immigrant visa are reluctant to proceed abroad to seek an immigrant visa." *Id.*

122.   Now, however, the unlawful provisional waiver process allows certain immigrant visa applicants to request the waiver before they leave. This means they can wait in the United States the many months (or even years) it takes for a decision on the waiver application; if the provisional unlawful presence waiver application is denied, the applicant may choose to postpone consular processing with the knowledge that they cannot presently overcome the unlawful presence inadmissibility ground if they depart. In the initial enacting regulation, DHS stated that "DHS anticipates that this new provisional unlawful presence waiver process will significantly reduce

the time that U.S. citizens are separated from their immediate relatives." *Id.*

123.   When USCIS grants a provisional unlawful presence waiver application, this grant is not an indication of whether any other inadmissibility issues apart from 8 U.S.C. § 1182(a)(9)(B) apply.

124.   USCIS possesses sole jurisdiction to adjudicate an application for provisional unlawful presence waiver (Form I-601A). 8 C.F.R. § 212.7(e)(1).

125.   In order for USCIS to have jurisdiction to adjudicate an application for a provisional unlawful presence waiver (Form I-601A) submitted by a person in removal proceedings, it is necessary that the applicant's removal proceedings be administratively closed prior to USCIS' receipt of the application. 8 C.F.R. § 212.7(e)(4)(iii).

126.   8 C.F.R. § 212.7(e)(3) delineates who may apply for a provisional unlawful presence waiver and states:

> Except as provided in paragraph (e)(4) of this section, a [noncitizen] may be eligible to apply for and receive a provisional unlawful presence waiver for the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act if he or she meets the requirements in this paragraph. A [noncitizen] may be eligible to apply for and receive a waiver if he or she:
>
> > **(i)** Is present in the United States at the time of filing the application for a provisional unlawful presence waiver;

**(ii)** Provides biometrics to USCIS at a location in the United States designated by USCIS;

**(iii)** Upon departure, would be inadmissible only under section 212(a)(9)(B)(i) of the Act at the time of the immigrant visa interview;

**(iv)** Has a case pending with the Department of State, based on:

> **(A)** An approved immigrant visa petition, for which the Department of State immigrant visa processing fee has been paid; or

> **(B)** Selection by the Department of State to participate in the Diversity Visa Program under section 203(c) of the Act for the fiscal year for which the [noncitizen] registered;

**(v)** Will depart from the United States to obtain the immigrant visa; and

**(vi)** Meets the requirements for a waiver provided in section 212(a)(9)(B)(v) of the Act.

127. 8 C.F.R. § 212.7(e)(4), in turn, delineates who is wholly ineligible and unable to apply for a provisional unlawful presence waiver, stating (emphasis added):

> Notwithstanding paragraph (e)(3) of this section, a [noncitizen] is ineligible for a provisional unlawful presence waiver under paragraph (e) of this section if:

> **(i)** The [noncitizen] is under the age of 17;

> **(ii)** The [noncitizen] does not have a case pending with the Department of State, based on:

> > **(A)** An approved immigrant visa petition, for which the Department of State immigrant visa processing fee has been paid; or

**(B)** Selection by the Department of State to participate in the Diversity Visa program under section 203(c) of the Act for the fiscal year for which the [noncitizen] registered;

**(iii)** *The [noncitizen] is in removal proceedings*, in which no final order has been entered, *unless the removal proceedings are administratively closed and have not been recalendared at the time of filing the application for a provisional unlawful presence waiver*;

**(iv)** The [noncitizen] is subject to an administratively final order of removal, deportation, or exclusion under any provision of law (including an in absentia order under section 240(b)(5) of the Act), unless the [noncitizen] has already filed and USCIS has already granted, before the [noncitizen] applies for a provisional unlawful presence waiver under 8 CFR 212.7(e), an application for consent to reapply for admission under section 212(a)(9)(A)(iii) of the Act and 8 CFR 212.2(j);

**(v)** CBP or ICE, after service of notice under 8 CFR 241.8, has reinstated a prior order of removal under section 241(a)(5) of the Act, either before the filing of the provisional unlawful presence waiver application or while the provisional unlawful presence waiver application is pending; or

**(vi)** The [noncitizen] has a pending application with USCIS for lawful permanent resident status.

128.   "General administrative closure is not specifically authorized by the INA or regulations governing [immigration judges] or the BIA." *Romero v. Barr*, 937 F.3d 282, 288 (4th Cir. 2019) (citing *Vahora v. Holder*, 626 F.3d 907, 917-18 (7th Cir. 2010) (noting that the general power to administratively close a case is "not a practice specified in

the [INA]" or "mentioned in the current regulations," but is a "procedural device" employed by quasi-judicial bodies for "orderly management of the docket" and is "reviewable by courts.")) (footnote omitted); *see also* 8 C.F.R. § 1003.9(b)(3) (granting the Office of the Chief Immigration Judge the authority to "direct that the adjudication of certain cases be deferred . . . and otherwise manage the docket of matters to be decided by the immigration judge."); 8 C.F.R. § 1003.1(a)(2)(i)(C) (granting the Chairman of the Board of Immigration Appeals the authority to "direct that the adjudication of certain cases be deferred . . . and otherwise to manage the docket of matters to be decided by the Board").

129.  "[A]dministrative closure is explicitly authorized or required by federal regulations addressing specific classes of potential visa recipients[1] and pursuant to various judicially approved settlement agreements." *Romero v. Barr*, 937 F.3d at 288 (footnote included in quotation) (citing *Barahona-Gomez v. Ashcroft*, 243 F. Supp. 2d 1029

---

[1] *See, e.g.*, 8 C.F.R. § 1214.2(a) (authorizing administrative closure for noncitizens who appear eligible for T-nonimmigrant status); 8 C.F.R. § 1214.3 (requiring administrative closure for noncitizens who appear eligible for V-nonimmigrant status); 8 C.F.R. § 1245.13(d)(3)(i) (requiring administrative closure in certain cases involving nationals of Cuba and Nicaragua who are eligible for LPR status); 8 C.F.R. § 1245.15(p)(4)(i) (same for certain Haitian nationals); 8 C.F.R. § 1245.21(c) (similar for certain nationals of Vietnam, Cambodia, and Laos).

(N.D. Cal. 2002) (requiring administrative closure for noncitizens who were improperly denied suspension of deportation but failed to appear for rescheduled hearings); *Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (requiring administrative closure for class members pending adjudication of claims by an asylum officer).

130. "Although general administrative closure is not specifically mentioned in the INA or its regulations, the BIA has referenced two regulations that confer broad powers to [immigration judges] and the BIA to manage their dockets as the authority for administrative closure." *Romero v. Barr*, 937 F.3d at 288 (citing 8 C.F.R. § 1003.10(b) and 8 C.F.R. § 1240.1(a) (providing that immigration judges shall have the authority in any removal proceeding to "[d]etermine removability," "make decisions, including orders of removal," "determine applications," "order withholding of removal," and "take any other action consistent with applicable law and regulations as may be appropriate")).

131. The regulation which governs the powers of the BIA states that BIA members "shall exercise their independent judgment and discretion" and that "a panel or Board member to whom a case is assigned may take *any action* consistent with their authorities under the Act and the regulations *as is appropriate and necessary* for the disposition of

the case." 8 C.F.R. § 1003.1(d)(1)(ii) (emphasis added); *see also Matter of Avetisyan*, 25 I. & N. Dec. 688, 695 (BIA 2012) (noting that administrative closure could facilitate "efficient[ ] management of the resources" of the immigration courts and the BIA).

132.    "[T]he BIA has issued numerous decisions authorizing [immigration judges] to administratively close cases for a variety of reasons related to conservation of court resources, such as when a petitioner is awaiting processing of a visa petition by DHS, [ . . . ] or is awaiting the resolution of a direct appeal of a criminal conviction . . . .  Indeed, as of October 2018, over 330,000 cases remained administratively closed." *Romero v. Barr*, 937 F.3d at 289 (citing *Matter of Hashmi*, 24 I. & N. Dec. 785, 791 n.4 (BIA 2009) and *Matter of Montiel*, 26 I. & N. Dec. 555 (BIA 2015)).

133.    On May 17, 2018, the Attorney General issued *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018), a precedential agency decision holding that immigration judges and the BIA do not have the general authority to administratively close cases because "[n]either section 1003.10(b) nor section 1003.1(d)(1)(ii) confers" such authority. *Id.* at 284. As a result, *Castro-Tum* held that immigration judges and the BIA may only administratively close cases when authorized to do so by a specific regulation or judicially approved settlement. *Id.* at 282-

92. The Attorney General also specifically held that the BIA could not administratively close cases for noncitizens wishing to seek provisional unlawful presence waivers (Form I-601A). *Id.* at 277 n.3, 286 n.9. The Attorney General concluded that to the extent any existing regulations delegated the general authority to administratively close cases, he was exercising his "discretion to revoke it because the practice of administrative closure thwarts the efficient and even-handed resolution of immigration proceedings." *Id.* at 288 n.10.

134.    Immigration judges are now holding that they lack the general authority to administratively close cases. Plaintiffs now seek judicial review of Defendants' unlawful agency action(s).

## **FACTUAL BACKGROUND**

135.    The immigration court in Fort Snelling, Minnesota "falls under the jurisdiction of the Office of the Chief Immigration Judge, which is a component of the Executive Office for Immigration Review under the Department of Justice." *See Fort Snelling Immigration Court*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/eoir/fort-snelling-immigration-court (last visited May 10, 2020).

136.    The Fort Snelling, Minnesota immigration court has jurisdiction over individuals placed into removal proceedings who live in Minnesota,

South Dakota, and North Dakota. Additionally, the Fort Snelling,
Minnesota immigration court also exercises jurisdiction over
individuals who live in other parts of the country if the individual in
removal proceedings moved away from one of these three states
without requesting or being granted a change of venue.

137.   According to publicly available data, as of March 2020, there was a
backlog of 1,129,890 immigration court cases throughout the United
States.[2]

138.   As of March 2020, the immigration court in Fort Snelling, Minnesota
had 13,175 pending cases.[3]

### *Removal Cases Move Slowly and Are Highly Inefficient*

139.   In the Minnesota immigration court, the average number of days that
currently pending immigration cases have been pending is 643 days.[4]

140.   In the Minnesota immigration court, the average number of days that
it took to complete a removal case was 564 days for Fiscal Year ("FY")

---

[2] *Immigration Court Backlog Tool*, TRAC,
https://trac.syr.edu/phptools/immigration/court_backlog/ (last visited May 10,
2020).
[3] *Supra* n.2.
[4] *Infra* n.5.

2018, 406 days for FY 2019, and the average is currently at 462 days

for cases completed during the ongoing FY 2020.[5]

141.   It is notable that a high number of detained cases with relatively

quick case completion rates drag the average down.[6] Illustratively,

although the average number of days per case it took to complete a

case in FY 2020 is only 462 days, the average time to complete each

case for persons who were put on the Fort Snelling immigration

court's "South Dakota VTC" (i.e., video teleconferencing) docket was

848 days.[7] Similarly, persons who were put on the "Bloomington" (i.e.,

Fort Snelling) docket averaged 771 days for a case completion, and

persons who were on the "North Dakota VTC" docket averaged 742

days per case completion.[8]

---

[5] *Immigration Court Processing Time by Charge*, TRAC, https://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_charge.php (last visited May 10, 2020) (sorted by "Minnesota" court and "average days" for "what to tabulate").

[6] *Supra* n.5 (when sorting by hearing location, one can quickly see that the average number of days for case completion is only 103 days for Jackson Parish Correctional Center, 158 days for Bloomington detained cases, 226 days for Federal Correctional Institution (FCI) Waseca cases, and 258 days for Minnesota Correctional Facility cases).

[7] *Supra* n.6.

[8] *Supra* n.6.

142.   Thus, for cases completed thus far in FY 2020, on average, it took
       more than 700 days for the Minnesota immigration court to complete
       a removal case for a non-detained adult.

143.   As of March 2020, the Fort Snelling, Minnesota immigration court
       had resolved or partially resolved 3,092 cases in FY 2020 (outcomes
       measured are: removals, voluntary departures, terminations,
       granting of relief, and administrative closures).[9]

144.   Of these 3,092 cases in FY 2020, 148 of the cases have resulted in
       administrative closure (112 of the 148 cases involved persons in
       Jackson Parish Correctional Center, 23 of the cases involved persons
       in the Bloomington Detained facility, and 13 of the cases involved
       persons in Bloomington (non-detained)).[10]

### *Administrative Closure Provides Substantive Benefits*

145.   In FY 2011 (before the creation of the provisional unlawful presence
       waiver), the Minnesota immigration court administratively closed
       just 57 cases.[11]

---

[9] *Immigration Court Processing Time by Outcome*, TRAC,
https://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outco
me.php (last visited May 10, 2020) (sorted by "completed cases" for "what to
tabulate," "all" for "outcome type," and "Minnesota" for "state").
[10] *Supra* n. 9 (sorted by "completed cases" for "what to tabulate,"
"administrative/other closure" for "outcome type," and "Minnesota" for
"state").
[11] *Supra* n.10.

146. In FY 2012 (before the creation of the provisional unlawful presence waiver), the Minnesota immigration court administratively closed 223 cases.[12]

147. In FY 2013 (the regulations creating the provisional unlawful presence waiver was made effective on March 4, 2013, meaning that the provisional unlawful presence waiver was available for the last 7 months of the 2013 fiscal year), the Minnesota immigration court administratively closed 855 cases.[13]

148. The explosion in administrative closures between FY 2012 and FY 2013 indicates that the immigration judges were responding to the creation of the provisional unlawful presence remedy by administratively closing cases for otherwise eligible applicants in removal proceedings so that they could file applications for provisional unlawful presence waivers.

149. In FY 2014, the Minnesota immigration court administratively closed 787 cases.[14]

150. In FY 2015, the Minnesota immigration court administratively closed 802 cases.[15]

---

[12] *Supra* n.10.
[13] *Supra* n.10.
[14] *Supra* n.10.
[15] *Supra* n.10.

151.  In FY 2016, the Minnesota immigration court administratively closed
      630 cases.[16]

152.  In FY 2017, the Minnesota immigration court administratively closed
      471 cases.[17]

153.  In FY 2018 (the year in which *Matter of Castro-Tum*, 27 I. & N. Dec.
      271 (A.G. 2018) was published), the Minnesota immigration court
      administratively closed just 92 cases.[18]

154.  In FY 2019, the Minnesota immigration court administratively closed
      140 cases.[19]

155.  Thus, between FY 2013 (when the provisional unlawful presence
      waiver was created) and FY 2018 (when the Attorney General issued
      *Matter of Castro-Tum*), the Minnesota immigration court
      administratively closed 3,367 cases.

156.  In FY 2013 (the first year in which the provisional unlawful presence
      waiver was made available), the Department of Homeland Security
      received a total of 19,085 applications for provisional unlawful
      presence waivers (on Form I-601A).[20]

---

[16] *Supra* n.10.
[17] *Supra* n.10.
[18] *Supra* n.10.
[19] *Supra* n.10.
[20] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2013*, USCIS,

157.   In FY 2013, DHS approved 4,482 applications for provisional unlawful presence waivers while 12,254 applications remained pending (indicating that 2,349 applications were denied).[21]

158.   In FY 2014, DHS received a total of 37,592 applications for provisional unlawful presence waivers.[22]

159.   In FY 2014, DHS approved 27,433 provisional unlawful presence waiver applications and 12,214 applications remained pending.[23]

160.   In FY 2015, DHS received a total of 48,734 applications for provisional unlawful presence waivers.[24]

161.   In FY 2015, DHS approved 34,396 applications for provisional unlawful presence waivers and 14,447 applications remained pending.[25]

---

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/AllForms-Q42013.pdf (last visited May 10, 2020).

[21] *Supra* n.20.

[22] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2014*, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/all_forms_performancedata_fy2014_qtr4.pdf (last visited May 10, 2020).

[23] *Supra* n.22.

[24] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2015*, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/all_forms_performancedata_fy2015_qtr4.pdf (last visited May 10, 2020).

[25] *Supra* n.24.

162.   In FY 2016, DHS received a total of 51,213 applications for provisional unlawful presence waivers.[26]

163.   In FY 2016, DHS approved 33,291 applications for provisional unlawful presence waivers and 27,822 applications remained pending.[27]

164.   In FY 2017, DHS received a total of 65,729 applications for provisional unlawful presence waivers.[28]

165.   In FY 2017, DHS approved 68,636 applications for provisional unlawful presence waivers and 22,711 applications remained pending.[29]

166.   In FY 2018 (the year in which *Matter of Castro-Tum* was issued), DHS received a total of 60,748 applications for provisional unlawful presence waivers.[30]

---

[26] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2016*, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/all_forms_performancedata_fy2016_qtr4.pdf (last visited May 10, 2020).
[27] *Supra* n.26.
[28] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2017*, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/Quarterly_All_Forms_FY17Q4.pdf (last visited May 10, 2020).
[29] *Supra* n.28.
[30] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2018*, USCIS,

52 | P a g e

167.   In FY 2018, DHS approved 41,580 applications for provisional unlawful presence waivers and 39,095 remained pending.[31]

168.   In FY 2019, DHS received a total of 52,506 applications for provisional unlawful presence waivers.[32]

169.   In FY 2019, DHS approved 46,092 applications for provisional unlawful presence waivers and 41,428 remained pending.[33]

170.   In the first quarter of FY 2020, DHS received a total of 12,948 applications for provisional unlawful presence waivers, which puts DHS on track to receive a total of 51,792 applications for provisional unlawful presence waivers in FY 2020.[34]

171.   In the first quarter of FY 2020, DHS approved a total of 9,937 applications for provisional unlawful presence waivers, which puts

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/Quarterly_All_Forms_FY18Q4.pdf (last visited May 10, 2020).

[31] *Supra* n.30.

[32] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2019*, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/Quarterly_All_Forms_FY19Q4.pdf (last visited May 10, 2020).

[33] *Supra* n.32.

[34] *See Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form Status 2020*, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/Quarterly_All_Forms_FY2020Q1.pdf (last visited May 10, 2020).

DHS on track to approve 39,748 applications for provisional unlawful

presence waivers in FY 2020.[35]

172.   At the end of the first quarter for FY 2020, 43,798 applications for

provisional unlawful presence waivers remained pending.[36]

173.   As the data above shows, the number of applications for provisional

unlawful presence waivers grew at a substantial clip, year-over-year,

from when they were first introduced in 2013 up through September

30, 2017 (which is about eight months before the Attorney General

issued *Matter of Castro-Tum*).

174.   The Attorney General then issued *Matter of Castro-Tum* on May 17,

2018 during the end of the second quarter of FY 2018. *See* 27 I. & N.

Dec. 271.

175.   FY 2018 was the first year in which the overall number of

applications for provisional unlawful presence waivers decreased

since they were first made available in 2013.

176.   The total number of applications for provisional unlawful presence

waivers, between FY 2017 and FY 2018, decreased by 5,251 (i.e., a

decrease of 7.988% from FY 2017).

---

[35] *Supra* n.34.
[36] *Supra* n.34.

177. The total number of applications for provisional unlawful presence waivers decreased again in FY 2019, this time by 8,242 (i.e., a decrease of 13.567% from FY 2018 and a decrease of 20.118% from FY 2017).

178. The total number of applications for provisional unlawful presence waivers in the first quarter of FY 2020 indicates that the total number of applications filed in FY 2020 will be similar to FY 2019, indicating that the decrease in applications filed appears to have normalized between FY 2019 and FY 2020.

179. Plaintiffs believe, quite plausibly, that the roughly 20% decrease in the number of applications for provisional unlawful presence waivers filed between FY 2017 and FY 2019-2020 is due to: (1) the Attorney General's issuance of *Matter of Castro-Tum*; (2) EOIR's unlawful adopting of a pattern or practice in which EOIR refuses to administratively close cases to allow persons to file applications for provisional unlawful presence waivers; and (3) the Secretary of Homeland Security's refusal to amend 8 C.F.R. § 212.7(e)(4)(iii) and simultaneous unlawful adoption of a pattern or practice that disallows individuals in removal proceedings from applying for provisional unlawful presence waivers.

180.  Plaintiffs lack access to data which indicates the number of applications for provisional unlawful presence waivers filed by persons in removal proceedings that have been administratively closed, but Defendants have this information and Plaintiffs believe it will be obtainable in discovery.

181.  It is likely that this data will show that, prior to the issuance of *Matter of Castro-Tum*, roughly 20% of applications for provisional unlawful presence waivers were filed by individuals in removal proceedings that were administratively closed which, in turn, will prove that Defendants' unlawful agency actions constitute substantive rulemaking which acts to deprive all individuals in removal proceedings of the ability to apply for a provisional unlawful presence waiver.

182.  Plaintiffs lack access to data which indicates the number of individuals in removal proceedings who are charged with being inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) (for entering without inspection) and who are also the beneficiary of an approved immediate relative I-130 petition (which classifies the individual in removal proceedings as the noncitizen spouse of a U.S. citizen or LPR), but Defendants have this information and Plaintiffs believe it will be obtainable in discovery.

183.   It is likely that this data will show that a huge number of persons in

removal proceedings before the Executive Office for Immigration

Review who would have been eligible to apply for a provisional

unlawful presence waiver prior to the Attorney General's issuance of

*Castro-Tum* are no longer eligible to apply for provisional unlawful

presence waivers as a result of: (1) the Attorney General's issuance of

*Matter of Castro-Tum*; (2) EOIR's unlawful adopting of a pattern or

practice in which EOIR refuses to administratively close cases to

allow persons to file applications for provisional unlawful presence

waivers and additional unlawful practice of blindly recalendaring

administratively closed cases upon the filing of a motion that is

opposed and which fails to provide good cause for recalendaring; and

(3) the Secretary of Homeland Security's refusal to amend 8 C.F.R. §

212.7(e)(4)(iii) and simultaneous issuance of a de facto regulation

(through binding policy) which requires Immigration and Customs

Enforcement ("ICE") attorneys in the Office of the Principal Legal

Advisor ("OPLA")[37] to file motions to recalendar all previously

administratively closed cases in a manner that effectively rewrites 8

---

[37] The Secretary of Homeland Security has delegated his authority to
prosecute removal cases to ICE, which in turn has delegated this authority to
OPLA.

C.F.R. § 212.7(e)(4)(iii) to wholly prevent persons in removal
proceedings from filing applications for provisional unlawful presence
waivers.

184. Defendants abused their discretion by taking actions which subtly,
subversively, and collusively change who is eligible to apply for a
provisional unlawful presence waiver without engaging in informal
rulemaking as is required by 5 U.S.C. § 553 of the Administrative
Procedure Act.

185. The reasons given by Defendants in support of these actions are
objectively unreasonable, inadequate, or otherwise improper.

### *Defendants Actions Have Decreased Agency Efficiency*

186. When the Attorney General issued *Matter of Castro-Tum*, 27 I. & N.
Dec. 271 (A.G. 2018), he stated that "administrative closure
encumbers the fair and efficient administration of immigration
cases." 27 I. & N. Dec. at 273.

187. Plaintiffs submit that administrative closure, for the specific purpose
of allowing an individual to file an application for a provisional
unlawful presence waiver, aids the fair and efficient administration of
immigration cases by removing from EOIR's dockets cases which may
be more easily resolved by USCIS, as was intended when DHS first
enacted the regulation that created the provisional unlawful presence

waiver. *See* 78 Fed. Reg. 536-01, 537 (Jan. 13, 2013) ("During discussions about the proposed provisional unlawful presence waiver process and how it would affect [noncitizen]s in removal proceedings, a question arose regarding the authority of Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) immigration judges (IJs) and whether IJs would adjudicate Forms I-601A for [noncitizen]s in removal proceedings. DHS determined that it would be more efficient and appropriate to have Form I-601A waivers centralized and adjudicated by one agency, USCIS, **especially given the intended streamlined nature of the process** and the need for close coordination with DOS once a waiver is decided.") (emphasis added).

188. For years, the Secretary of Homeland Security stayed true to its stated mission, memorialized in the implementing regulations, and provided a streamlined process for the adjudication of provisional unlawful presence waivers.

189. Illustratively, in FY 2014, the average processing time for a provisional unlawful presence waiver application was 4.6 months.[38]

---

[38] *See Historical National Average Processing Time for All USCIS Offices*, USCIS, AILA Doc. No. 18112934, available at https://www.aila.org/infonet/processing-time-reports/historical-average-

190.   In FY 2015, the average processing time for a provisional unlawful presence waiver application was 4.6 months.[39]

191.   In FY 2016, the average processing time for a provisional unlawful presence waiver application was 2.7 months.[40]

192.   In FY 2017, the average processing time for a provisional unlawful presence waiver application was 4.9 months.[41]

193.   In FY 2018, the average processing time for a provisional unlawful presence waiver application was 5.4 months.[42]

194.   Thus, all the way through FY 2018, the Secretary of Homeland Security continued to streamline the provisional unlawful presence waiver process. This all changed, however, in FY 2019 and beyond.

195.   In FY 2019, the average processing time for a provisional unlawful presence waiver application rose to 8.7 months (this represents a 61.111% increase from FY 2018).

196.   In FY 2020, the current average processing time for a provisional unlawful presence waiver is alleged by USCIS to be 10 months (this

---

processing-times/uscis-national-average-processing-times-9-30-18 (last visited May 10, 2020).

[39] *Supra* n.38.

[40] *Supra* n.38.

[41] *Supra* n.38.

[42] *Historical National Average Processing Time (in Months) for All USCIS Offices for Select Forms by Fiscal Year*, USCIS, https://egov.uscis.gov/processing-times/historic-pt (last visited May 10, 2020).

represents a 14.943% increase from FY 2019 and a 85.185% increase from FY 2018).[43]

197.   Notably, conflicting data (also published by USCIS) indicates that the current average processing time for applications for provisional unlawful presence waivers actually ranges from 10 months to 16.5 months.[44]

198.   The drastic increases in processing times of applications for provisional unlawful presence waivers helps show the multifaceted stratagems which Defendants are using to justify their unlawful actions.

199.   For example, in *Matter of Castro-Tum*, the Attorney General took umbrage with the fact that cases which are administratively closed remained administratively closed for what he deemed to be an unacceptably long time. Ever since *Matter of Castro-Tum* was issued, however, the Secretary of Homeland Security, through his delegates, has issued binding guidance to USCIS which has intentionally caused the provisional unlawful presence waiver application and adjudication process to become less efficient, thus increasing the time

---

[43] *Supra* n.42.

[44] *See Check Case Processing Times: Processing Time for Application for Provisional Unlawful Presence Waiver I-601A) at Potomac Service Center*, USCIS, https://egov.uscis.gov/processing-times/ (last visited May 10, 2020).

that an administratively closed case will remain administratively closed.

200.   In essence, Defendants have intentionally taken a variety of actions to make themselves less efficient agencies and then pretextually blamed this lack of efficiency on administrative closure as a way to justify the Attorney General's ultra vires decision which implicitly amended the provisional unlawful presence waiver regulations without engaging in the necessary process of legislative rulemaking.

201.   With regards to EOIR, and how administrative closure for the purposes of applying for a provisional unlawful presence waiver aids the fair and efficient administration of immigration cases, it is notable that at the time *Matter of Castro-Tum* was issued, the Attorney General identified that, at the end of FY 2017, there were 355,835 administratively closed cases that had not been recalendared. 27 I. & N. Dec. at 293.

202.   Prior to 2012, EOIR did not allow cases to be administratively closed over the opposition of either party. *See Matter of Amico*, 19 I. & N. Dec. 652 (BIA 1988); *Matter of Lopez-Barrios*, 20 I. & N. Dec. 203 (BIA 1990); *Matter of Munoz-Santos*, 20 I. & N. Dec. 205 (BIA 1990); *Matter of Gutierrez-Lopez*, 21 I. & N. Dec. 479 (BIA 1996); *Matter of Avetisyan*, 25 I. & N. Dec. 688 (BIA 2012), overruling *Matter of*

*Gutierrez-Lopez*. As such, it is inconceivable that the cases that were administratively closed prior to 2012, and which were only reopened because of *Matter of Castro-Tum*, are high-priority cases that were simply forgotten about.

203. Similarly, when the Board of Immigration Appeals issued *Matter of Avetisyan* in 2012, the Board recognized that "the rule [that both parties must consent] . . . directly conflicts with the delegated authority of the immigration judges and the Board and their responsibility to exercise independent judgment and discretion in adjudicating cases and to take any action necessary and appropriate for the disposition of the case." 25 I. & N. Dec. at 693.

204. In *Matter of Avetisyan*, the Board merely allowed for a case-specific inquiry to see whether administrative closure was proper. It is highly unlikely that immigration judges or the Board would allow for administrative closure of a high-priority case. As such, it is inconceivable that cases closed after 2012 and which were only reopened because of *Matter of Castro-Tum* are high-priority cases that were simple forgotten about.

205. After *Matter of Avetisyan*, the Department of Homeland Security often allowed—and even recommended—administratively closing "non-priority" cases as a tool to preserve government resources." *See,*

*e.g.*, Memorandum from Riah Ramlogan, Acting Principal Legal Advisor, Immigration & Customs Enf't, to Office of the Principal Legal Advisor Attorneys 2 (Apr. 6, 2015), https://www.ice.gov/doclib/foia/prosecutorial-discretion/guidance_eoir_johnson_memo.pdf (directing ICE attorneys to "generally seek administrative closure or dismissal of cases [DHS] determines are not priorities").

206.    In light of the fact that the backlog of immigration court cases in 2018, at the time *Matter of Castro-Tum* was issued, was more than 700,000, allowing immigration judges to focus on high-priority cases by administratively closing cases which may be more easily and more quickly resolved by USCIS (through the provisional unlawful presence waiver process) clearly aids, rather than obstructs, the fair and efficient administration of immigration cases. The Attorney General's statements to the contrary are objectively unreasonable, improper, or otherwise inadequate.

207.    The inadequacy and inaccuracy of the Attorney General's statements in *Matter of Castro-Tum* can be easily shown by the ballooning of Minnesota's immigration court's backlog of cases.[45]

---

[45] *See supra* n.2 (sorted by "Minnesota" for "state," "pending cases" for "what to graph," and "all charges" for "charge types").

208. Illustratively, through FY 2015, the most pending cases the Minnesota immigration court had at one time was 3,546 cases. [46]

209. Due to shifts in enforcement priorities between the outgoing and incoming presidential administrations in 2016, the backlog of pending cases rose in FY 2016 to 4,416, rose again in FY 2017 to 6,095, and rose a third time in FY 2018 to 8,015 cases. [47]

210. Due to the Attorney General's issuance of *Matter of Castro-Tum*, Minnesota's immigration court's backlog of pending cases ballooned in FY 2019 to 13,703, and is on pace to have a backlog of 13,175 cases by the end of FY 2020 (without accounting for the massive delays and rescheduling caused by the ongoing COVID-19 pandemic).[48]

211. It is hard to fathom how EOIR's adjudicators can become more efficient adjudicators when their case loads are increasing year-over-year while their tools to efficiently manage their docket are destroyed. [49]

---

[46] *Supra* n.45.
[47] *Supra* n.45.
[48] *Supra* n.45.
[49] *See generally Adjudication Statistics: Pending Cases*, EOIR, AILA Doc. No. 18051040, https://www.justice.gov/eoir/page/file/1242166/download (last visited May 12, 2020) (in FY 2017, the backlog was 655,992 cases, in FY 2018 it was 796,346 cases, in FY 2019 it was 1,079,168 cases, and the backlog as of the second quarter of FY 2020 is 1,122,697 cases); *see also Adjudication Statistics: Case Appeals Filed, Completed, and Pending*, EOIR, AILA Doc. No. 19090307, https://www.justice.gov/eoir/page/file/1248501/download (showing

212.  Aside from the fact that administrative closure aids rather than obstructs general administrative efficiency, it is interesting that, according to EOIR's own statistics, the Attorney General's statement in *Castro-Tum* that there were 355,835 administratively closed cases that had not been recalendared at the end of FY 2017, *see* 27 I. & N. Dec. at 293, appears to be a patent falsity used to exaggerate the scope of the issue. *See Adjudication Statistics: Administratively Closed Cases*, EOIR, AILA Doc. No. 18051047.[50]

213.  According to EOIR, only 339,464 administratively closed cases existed at the end of FY 2017. *Id.*

214.  Two years after the issuance of *Castro-Tum*, at the end of the second quarter of FY 2020, 316,727 cases are *still* administratively closed. *Id.*

215.  Additionally, with regards to the administrative efficiency of EOIR, it is notable that many of the individuals in removal proceedings who wish to apply for a provisional unlawful presence waiver, and who would be eligible to apply but for being in removal proceedings that

---

that the number of case appeals completed by the BIA has been dropping year-over-year from FY 2017-2020 while the number of pending appeals ballooned from 12,677 in FY 2017 to 66,931 in FY 2019; as of the end of the second quarter of FY 2020, the current number of pending appeals at the BIA is an astounding 82,097).

[50] Available at: https://www.justice.gov/eoir/page/file/1061521/download (last visited May 12, 2020).

are not administratively closed, are now compelled to instead seek

non-LPR cancellation of removal under 8 U.S.C. § 1229b(b) because

they are unable to administratively close their removal proceedings

due to *Castro-Tum*.

216.   Non-LPR cancellation of removal under 8 U.S.C. § 1229b(b) may only

be granted to 4,000 individuals per fiscal year, whereas there is no

limit to the number of immediate relative immigrant visas available

to spouses of U.S. citizens, and there are tens of thousands of family-

preference immigrant visas available per fiscal year for the spouses of

LPRs. *See* 8 U.S.C. § 1229b(e); 8 U.S.C. § 1151; 8 U.S.C. § 1153.

217.   According to EOIR, the agency received 30,421 applications for non-

LPR cancellation of removal (filed on Form "EOIR-42B"). *See*

*Executive Office for Immigration Review; Fee Review*, 85 Fed. Reg.

11866-01, 11869 (Feb. 28, 2020).

218.   Because the hardship and qualifying relative requirements for non-

LPR cancellation of removal are highly similar to the hardship and

qualifying relative requirements for provisional unlawful presence

waivers (with the main two differences being that: (1) non-LPR

cancellation of removal requires meeting a higher hardship threshold;

and (2) non-LPR cancellation of removal allows U.S. citizen or LPR

children, spouses, and parents to count as a qualifying relative

whereas the provisional unlawful presence waiver only considers hardship to qualifying relatives that are U.S. citizen or LPR spouses or parents), it is likely that at least 50% of the individuals who qualify to file non-LPR cancellation of removal applications (or roughly 15,000 people in FY 2018) would qualify to instead file provisional unlawful presence waiver applications if only such persons were allowed to administratively close their removal proceedings to apply for a provisional unlawful presence waiver.

219.   In promulgating a proposed rule to adjust EOIR's application fees, EOIR acknowledged that EOIR is losing a significant amount of money on the adjudication of non-LPR cancellation of removal applications. *See* 85 Fed. Reg. 11866-01, 11869 (Feb. 28, 2020) (evidencing that EOIR estimates it lost $7,912,502 in FY 2018 alone adjudicating non-LPR cancellation of removal applications).

220.   In contrast, DHS estimated that the average cost of adjudicating a I-601A application (i.e., a provisional unlawful presence waiver application) is roughly $807. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62280-01, Docket ID: USCIS-2019-0010, Supporting and Related Material, Immigration

Examinations Fee Account at Appendix V (Nov. 14, 2019),

https://www.regulations.gov/document?D=USCIS-2019-0010-0007.

221. Currently DHS charges $630 in application fees for an I-601A waiver and another $85 for biometrics fees if the applicant is under the age of 79 at time of filing the application. As such, according to DHS' cost estimates, DHS only loses $92 per I-601A application meaning that, for the 52,506 I-601A applications DHS received in FY 2019, it will lose, at most, $4,830,552.

222. In comparison, EOIR managed to lose nearly $8,000,000, in FY 2018 alone, simply by adjudicating roughly 30,432 non-LPR cancellation of removal applications.[51]

223. To clarify, EOIR currently (and at the time of *Castro-Tum*'s issuance) loses roughly $260 per non-LPR cancellation of removal application adjudicated by EOIR. In comparison, DHS loses only $92 per provisional unlawful presence waiver application adjudicated by DHS. If we assume that roughly 50% of the individuals who apply for non-LPR cancellation of removal (or 15,216 individuals in FY 2018) would be eligible to instead apply for a provisional unlawful presence

---

[51] In 85 FR 11866-01, EOIR acknowledges that it lost $7,912,502 in FY 2018 and that it believes it is losing $260 per application. Thus, $7,912,502 divided by $260 per application is 30,432 total applications adjudicated by EOIR in FY 2018.

waiver and would choose to do so given the chance, EOIR would save $3,956,160 per year[52] while freeing up administrative resources to focus on high-priority cases that cannot be more easily resolved outside of immigration court. In exchange for this nearly $4,000,000 in savings, DHS would only lose $1,399,872,[53] netting the federal government a total savings of $2,556,288 per 15,216 administrative closures (or $168 per administrative closure).

224. Additionally, as was made clear previously, it takes substantially longer (roughly two to two-and-a-half times longer) for EOIR's Minnesota immigration court to adjudicate non-LPR cancellation of removal cases than it does for DHS to adjudicate I-601A applications for provisional unlawful presence waivers.[54]

---

[52] 15,216 applications multiplied by $260 in unrecovered expenses per application = $3,956,160.

[53] 15,216 applications multiplied by $92 in unrecovered expenses per application = $1,399,872.

[54] *Cf. supra* n.9 (sorted by "average days" for "what to tabulate," "all" for "outcome type," and "Minnesota" for "state") (showing that, during FY 2020, the Minnesota immigration court took an average of 742 days to complete non-detained hearings on the North Dakota VTC docket, 771 days to complete non-detained hearings at the Bloomington / Fort Snelling immigration court, and 848 days to complete non-detained hearings on the South Dakota VTC docket) *with supra* n.42 (showing that DHS is currently processing I-601A applications for provisional unlawful presence waivers in roughly 10-16 months, or 300-480 days, which is roughly half the time necessary to process the average non-LPR cancellation of removal case in the Minnesota immigration court).

225. On January 31, 2020, the Acting Deputy Director of EOIR released Policy Memorandum 20-07 [hereinafter "PM 20-07][55] which provided the guidelines for efficient docketing practices of the immigration courts and provided a priority-based framework for immigration judges to implement.

226. EOIR's PM 20-07 explicitly provides that detained cases are the highest priority. Conversely, PM 20-07 relegates non-detained removal hearings (such as the type which involve non-detained persons applying for non-LPR cancellation of removal and persons who wish to administratively close their removal proceedings in order to apply for a provisional unlawful presence waiver) to one of the lowest priorities.

227. Considering that I-601A waiver applications for provisional unlawful presence waivers can be processed at roughly twice the speed as a non-LPR cancellation of removal application adjudicated by the Minnesota immigration court, and considering that allowing an individual in removal proceedings to instead apply for a provisional unlawful presence waiver saves the federal government an average of $168 per provisional waiver application, and considering that EOIR's

---

[55] Available at: https://www.justice.gov/eoir/page/file/1242501/download.

backlog of non-detained removal cases (which are generally EOIR's lowest priority) continues to expand, it appears abundantly clear that administratively closing removal proceedings for individuals who have filed or will file an application seeking non-LPR cancellation of removal with EOIR so that they may instead file an application for a provisional unlawful presence waiver with DHS is more administratively efficient than is *Castro-Tum*'s new legislative rule which wholly disallows administrative closure for individuals who wish to file an application for a provisional unlawful presence waiver.

228.   In light of these facts, the Court should wholly discount the Attorney General's statement that administrative closure harms the efficient administration of justice because this agency statement is unreasonable, improper, inadequately reasoned, and completely incapable of justifying the Attorney General's new rule, first announced in *Castro-Tum*, disallowing administrative closure of Plaintiffs' removal cases. It is clear that administratively closing Plaintiffs' removal cases will aid, rather than hurt, the efficient administration of removal cases before EOIR.

### *Administrative Closure Has Been Replaced with Status Dockets*

229.   It is essential to understand that EOIR has not somehow become more focused on adjudicating every case before it as a result of

removing EOIR's adjudicators' ability to administratively close cases for good cause. Rather, EOIR has replaced administrative closure with the "status docket," a near-doppelganger of administrative closure.

230. The status docket used by EOIR operates in the same manner as administrative closure, albeit with an extra quarterly reporting requirement (or "status docket update"), in that being on the status docket results in the individual who is on the status docket being granted a series of continuances (without having to request them) until a collateral matter has been resolved.

231. Unfortunately, because the term "status docket" is not synonymous with "administrative closure," persons on EOIR's status docket are ineligible to apply for provisional unlawful presence waivers while they're on the status docket. This is somewhat nonsensical because EOIR's adjudicators routinely approve motions to be placed on the status dockets for individuals who wish to file an I-130 application, the approval of which is a necessary prerequisite to applying for a provisional unlawful presence waiver.

232. The statements in the preceding paragraph hold true even when the individual who is applying for an I-130 application will be ineligible

to adjust their status in the United States if their I-130 application is
approved.

233.   In essence, the sole material difference between EOIR's increased use
of the "status docket," post *Castro-Tum*, is that it operates in a
manner purposely designed to deprive individuals in removal
proceedings of the opportunity to apply for a provisional unlawful
presence waiver.

234.   In light of the foregoing, it appears clear that the reasoning provided
by the Attorney General in *Castro-Tum* was pretextual drivel meant
to disguise, as nothing more than a lawful interpretation of
regulation, a variety of ultra vires and otherwise unlawful actions by
Defendants which, taken together, have deprived a monstrous class of
individuals of equal protection of the law and due process (in addition
to violating the Administrative Procedure Act).

### *Matter of Castro-Tum Constitutes Legislative Rulemaking*

235.   It is well-established that a hybrid administrative agency, such as the
Executive Office for Immigration Review, generally has discretion
(subject to limits) to choose whether to promulgate rules through the
informal rulemaking process or through agency adjudications.

236.   However, 5 U.S.C. § 554 of the Administrative Procedure Act makes
it abundantly clear that agency adjudications are the result of

hearings in which the individual subjected to the hearing is timely
informed of the matters of fact and law asserted.

237.   Additionally, it is understood that an agency must engage in the
informal rulemaking process in order to adopt new legislative rules.

238.   In *Castro-Tum*, the Attorney General spent very little time discussing
the facts of Castro-Tum's case and the underlying case history. *See* 27
I. & N. Dec. at 273-74, 278-81. The rest of the 24-page opinion reads
like a proposed regulation and touches on matters completely outside
the facts of the case. *See* 27 I. & N. Dec. 271.

239.   According to the *Attorney General's Manual on the APA*:

> "Rule making is agency action which regulates the future
> conduct of either groups of persons or of a single person;
> it is essentially legislative in nature, not only because it
> operates in the future but also because it is primarily
> concerned with policy considerations. **The object of the
> rule making proceeding is the implementation or
> prescription of law or policy for the future, rather
> than the evaluation of a respondent's past conduct.**
> Typically, the issues relate not to the evidentiary facts, as
> to which the veracity and demeanor of witnesses would
> often be important, but rather to the policy-making
> conclusions to be drawn from the facts . . . **Conversely,
> adjudication is concerned with the determination
> of past and present rights and liabilities . . . In such
> [adjudicatory] proceedings, the issues of fact are
> often sharply controverted.**

ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE

ACT at 14-15 (1947) (citations omitted) (emphasis added).

240. As the Attorney General's own policy manual makes clear, the Attorney General's decision in *Castro-Tum* was not based on the evidentiary facts, as to which the veracity and demeanor of the witnesses or parties would be important or in which the issues of fact are sharply controverted. *See* 27 I. & N. Dec. at 273-74.

241. Thus, *Matter of Castro-Tum* hardly fits the mold of an adjudicatory decision.

242. Rather, the Attorney General's decision in *Castro-Tum* had the object of implementing or prescribing law or policy for the future with no regard for Castro-Tum's past conduct (in fact, Castro-Tum was never given notice of the proceedings against him *or* of the Attorney General's eventual decision). *See* 27 I. & N. Dec. 271.

243. Thus, *Matter of Castro-Tum* fits the mold of legislative rulemaking as snugly as a well-fitting turtleneck.

244. The conclusion that *Castro-Tum* represents legislative rulemaking is supported by case law.

245. In *American Mining Congress v. Mine Safety & Health Administration*, the D.C. Circuit Court of Appeals provided a seminal four-part test for determining whether a rule is legislative or interpretive. *See* 995 F.2d 1106 (D.C. Cir. 1993).

246.   In *American Mining Congress*, the D.C. Court of Appeals held that, if

any of the following four criteria are met, the agency action is a

legislative rule subject to notice-and-comment procedures. The test

asks: (1) whether in the absence of the rule there would not be an

adequate legislative basis for enforcement action or other agency

action to confer benefits or ensure the performance of duties; (2)

whether the agency has published the rule in the Code of Federal

Regulations; (3) whether the agency has explicitly invoked its general

legislative authority; or (4) whether the rule effectively amends a

prior legislative rule. *Id.* at 1112; *see also Perez v. Mortgage Bankers*,

2014 WL 9866132 (Oral Argument, Dec. 1, 2014) at 39 (Justice Kagan

treated the *American Mining Congress* case as the D.C. Circuit's

leading case on distinguishing interpretive rules from legislative

rules).

247.   In the absence of *Castro-Tum*, there would be no adequate legislative

basis for EOIR adjudicators (including immigration judges and the

Board of Immigration Appeals) to refuse, across the board, to

administratively close removal proceedings for the sole purpose of

allowing an individual in removal proceedings to apply for a

provisional unlawful presence waiver. As such, the first, and arguably

most important, criterion of *American Mining Congress* is satisfied, indicating that *Castro-Tum* represents legislative rulemaking.

248. Moreover, in the absence of *Castro-Tum*, there would be no adequate legislative basis for EOIR adjudicators to deprive Plaintiffs of the substantive benefit of being allowed to apply for a provisional unlawful presence waiver.[56] This provides further support for finding that the first criterion of *American Mining Congress* is satisfied.

249. In *Castro-Tum*, the Attorney General explicitly invokes his general legislative authority under 8 U.S.C. § 1103(g)(2) to "'establish such regulations . . . as the Attorney General determines to be necessary for carrying out' the duty to oversee all law related to the immigration and naturalization of [noncitizens]." 27 I. & N. Dec. at 281. As such, the third criterion of *American Mining Congress* is satisfied, indicating that *Castro-Tum* represents legislative rulemaking.

---

[56] *See, e.g.*, *I.N.S. v. St. Cyr*, 533 U.S. 289, 307-308, 121 S. Ct. 2271, 2283, 150 L. Ed. 2d 347 (2001) ("Traditionally, courts recognized a distinction between eligibility for discretionary relief, on the one hand, and the favorable exercise of discretion, on the other hand. See Neuman, 113 Harv. L. Rev., at 1991 (noting the 'strong tradition in habeas corpus law ... that subjects the legally erroneous failure to exercise discretion, unlike a substantively unwise exercise of discretion, to inquiry on the writ'). Eligibility that was 'governed by specific statutory standards' provided 'a right to a ruling on an applicant's eligibility,' even though the actual granting of relief was 'not a matter of right under any circumstances, but rather is in all cases a matter of grace.'").

250.  In *Castro-Tum*, the Attorney General also invoked his certification

power under 8 C.F.R. § 1003.1(h)(1) which involves his general

legislative power under 8 U.S.C. § 1103(g). 27 I. & N. Dec. at 272,

281. This provides further support for the conclusion that the third

criterion of *American Mining Congress* is satisfied, indicating that

*Castro-Tum* represents legislative rulemaking.

251.  Notably, because the Attorney General invoked his certification

power under 8 C.F.R. § 1003.1(h)(1) simply to bypass the

Administrative Procedure Act's legislative rulemaking notice-and-

comment procedures, the Attorney General's use of his certification

power, as applied to *Castro-Tum*, was an unreasonable interpretation

of 8 U.S.C. § 1103(g) and thus ultra vires. As such, it cannot now be

used by Defendants as a proper basis for denying Plaintiffs' motions

to administratively close their removal proceedings. *Ex parte Young*,

209 U.S. 123, 159-60, 28 S. Ct. 441, 454, 52 L. Ed. 714 (1908) ("The

Act to be enforced is alleged to be unconstitutional, and if it be so, the

use of the name of the State to enforce an unconstitutional act to the

injury of complainants is a proceeding without the authority of and

one which does not affect the State in its sovereign or governmental

capacity. It is simply an illegal act upon the part of a state official in

attempting by the use of the name of the State to enforce a legislative

enactment which is void because unconstitutional . . .").

252.   Moreover, the Attorney General's invocation of his legislative

authority, and the rules he pronounced in *Castro-Tum*, conspire

together to implicitly amend a variety of prior legislative rules and

regulations, including, *inter alia*, 8 C.F.R. § 1003.1, 8 C.F.R. § 1003.9,

8 C.F.R. § 1003.10, 8 C.F.R. § 1240.1, and even 8 C.F.R. §

212.7(e)(4)(iii). As such, the fourth criterion of *American Mining*

*Congress* is satisfied, indicating that *Castro-Tum* represents

legislative rulemaking.

253.   The Attorney General's issuance of *Matter of Castro-Tum* reflects

final agency action.

254.   The Attorney General's issuance of *Matter of Castro-Tum* also

constitutes a de facto rule or binding norm that could not be properly

promulgated absent the notice-and-comment rulemaking required by

the Administrative Procedure Act. *See Ctr. For Auto Safety & Pub.*

*Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798,

806 (D.C. Cir. 2006).

255.   Thus, *Matter of Castro-Tum* constitutes improper legislative

rulemaking that did not comply with the notice-and-comment

procedures of the Administrative Procedure Act.

256. Because Defendants were *required* to comply with the notice-and-comment procedures of 5 U.S.C. § 553, Defendants were also required to published a proposed rule and determine whether the Regulatory Flexibility Act, 5 U.S.C. § 601, required an impact statement showing how the rules announced in *Castro-Tum* will affect small businesses and small organizations.

257. Considering that the rules announced in *Castro-Tum* have made a massive number of legal representation contracts—between immigration attorneys and individuals in removal proceedings—impossible to execute (i.e., contracts that provide for administratively closing removal proceedings and filing an application for a provisional unlawful presence waiver), the effect that *Castro-Tum* had on small businesses and organizations is immense. The Attorney General should have considered these consequences before promulgating the rules announced in *Castro-Tum*.

258. Had the Attorney General complied with the informal rulemaking procedures required under 5 U.S.C. § 553, he also would have had to comply with Executive Orders 12866 and 13653, which combine to direct agencies to assess the costs and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic,

environmental, public health and safety effects, distributive impacts, and equity).

259.   Executive Order 13653, specifically, emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. *See* Improving Regulation and Regulatory Review, 76 Fed. Reg. 3821, Exec. Order No. 13563 (Jan. 18, 2011)

260.   Notably, Section 4 of Executive Order 13653 explicitly provides that,

> Where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, each agency **shall** identify and consider **regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public.** These approaches include warnings, **appropriate default rules**, and disclosure requirements as well as provision of information to the public in a form that is clear and intelligible.

261.   Plaintiffs allege that the Attorney General's *Matter of Castro-Tum* decision is wholly unconcerned with quantifying the costs and benefits of ending administrative closure in context relevant to plaintiffs. As such, *Matter of Castro-Tum* is inconsistent with the mandate of Executive Order 13653.

262.   Plaintiffs allege that the Attorney General's *Matter of Castro-Tum* decision is wholly unconcerned with reducing costs to EOIR or other

federal government agencies. As such, *Matter of Castro-Tum* is inconsistent with the mandate of Executive Order 13653.

263.  Plaintiffs allege that the Attorney General's *Matter of Castro-Tum* decision is diametrically opposed to Executive Order 13653's edict to harmonize rules (e.g., *Castro-Tum* completely contravenes 8 C.F.R. § 212.7(e)(4)(iii)) and provide flexibility. As such, *Matter of Castro-Tum* is inconsistent with the mandate of Executive Order 13653.

264.  Executive Order 12866 defines the phrase "Significant regulatory action" as meaning "any regulatory action that is likely to result in a rule that may . . .  (2) **Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency**; . . .  or (4) **Raise novel legal or policy issues** arising out of legal mandates . . ." Regulatory Planning and Review, Exec. Order No. 12866 § 3(f)(2), (4), 58 Fed. Reg. 51735 (Sept. 30, 1993) (emphasis added).

265.  Plaintiffs allege that the Attorney General's issuance of *Matter of Castro-Tum* creates a serious inconsistency and otherwise interferes with 8 C.F.R. § 212.7(e)(4)(iii) and effectively makes DHS' planned actions of adjudicating applications for provisional unlawful presence waivers filed by individuals in removal proceedings impossible to execute because of the direct interference of the Attorney General and

EOIR. As such, *Matter of Castro-Tum* is a significant regulatory

action under Executive Order 12866.

266.   Plaintiffs further allege that the Attorney General's issuance of

*Matter of Castro-Tum* raises a variety of novel legal or policy issues

arising out of the Attorney General's legal mandate. As such, *Matter*

*of Castro-Tum* is a significant regulatory action under Executive

Order 12866.

267.   Because *Matter of Castro-Tum* is a significant regulatory action, the

Attorney General and EOIR should have complied with the

requirements of Section 6(a)(3)(B), meaning that the Attorney

General should have provided a reasonably detailed description of the

need for ending the practice of administrative closure, along with an

assessment of the potential costs and benefits of the regulatory

action. 58 Fed. Reg. 51735 § 6(a)(3)(B)(i)-(ii) (Oct. 4, 1993).

268.   Additionally, because *Matter of Castro-Tum* is a significant regulatory

action, the Attorney General and EOIR should have complied with

the requirements of Section 6(a)(3)(C), meaning that the Attorney

General should have provided: (i) an assessment, including the

underlying analysis, of costs and benefits anticipated from the

regulatory action, and any adverse effects on the efficient functioning

of the economy, private markets, health, safety, etc.; (ii) an

assessment, including the underlying analysis, of costs and benefits of
potentially effective and reasonably feasible alternatives to the
planned regulation and an explanation for why the planned
regulatory action is preferable to the identified potential alternatives.
*Id.* § 6(a)(3)(C)(i)-(iii).

269.   For all of the aforementioned reasons, Plaintiffs submit that *Matter of
Castro-Tum* constitutes a legislative rule that did not comply with the
notice-and-comment requirements of the Administrative Procedure
Act; Plaintiffs challenge Defendants' reliance on *Matter of Castro-
Tum* as a proper basis for denying Plaintiffs' motions to
administratively close proceedings.

### *Matter of Castro-Tum Constitutes an Abuse of Discretion*

270.   It is well-established that a hybrid administrative agency, such as the
Executive Office for Immigration Review, generally has discretion
(subject to limits) to choose whether to promulgate rules through the
informal rulemaking process or through agency adjudications.

271.   In this case, Defendants abused their discretion by issuing *Matter of
Castro-Tum* by way of a precedential agency adjudication *even if
Matter of Castro-Tum* does not constitute legislative rulemaking.
*Accord SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S. Ct. 1575, 1580,
91 L. Ed. 1995 (1947); *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759,

764, 89 S. Ct. 1426, 1429, 22 L. Ed. 2d 709 (1969); *N.L.R.B. v. Bell*

*Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294, 94 S. Ct. 1757,

1771, 40 L. Ed.2d 134 (1974); *Patel v. Immigration & Naturalization*

*Serv.*, 638 F.2d 1199, 1205 (9th Cir. 1980) ("In contrast, the job-

creation criterion of Heitland does not call for a case-by-case

determination. It may be stated and applied as a general rule even

though the result may vary from case to case. In addition to our

conclusion that Heitland was an improper circumvention of

rulemaking procedure, we also conclude that the Board abused its

discretion by applying the job-creation criteria to Patel.") (citation

omitted); *Texaco Inc. v. Fed. Power Comm'n*, 412 F.2d 740, 745 (3d Cir.

1969) ("However, the crucial fact is that the Commission elected to

proceed in this case by making a general rule and, when engaged in

rule-making, it must comply with the procedural requirements

imposed on rule-making by the Administrative Procedure Act, which it

failed to do in promulgating Order No. 362.") (footnote omitted).

272.  Because the Attorney General used an agency adjudication to

announce a general rule with little to no regard for the facts of the

case, the Attorney General abused his discretion by using *Matter of*

*Castro-Tum* to improperly skirt the rulemaking procedures of the

Administrative Procedure Act. *Supra.*

273. This abuse of discretion was compounded by the fact that the Attorney General cherrypicked a case in which the interests of the noncitizen at hand were not represented (because the noncitizen in *Castro-Tum* lacked any notice of the proceedings) in order to announce a general rule by adjudication. *See* 27 I. & N. Dec. at 273-74 ("Despite several efforts to notify the respondent of his hearing dates, he repeatedly failed to appear. The Immigration Judge nonetheless continued this case four times and finally ordered the case administratively closed on the ground that DHS had not shown it had a sufficiently reliable address to provide adequate notice.").

274. The Attorney General further abused his discretion in *Castro-Tum* by announcing, via agency adjudication, a general rule that was broader than the facts of the case.

275. More specifically, *Castro-Tum* involved an unaccompanied minor (i.e., a child without any parents or a guardian in the United States) who never appeared for his removal hearing after being served with a Notice to Appear. 27 I. & N. Dec. at 273. Because the immigration judge was not satisfied that DHS had met their burden of proving that it had a sufficiently reliable address on file to provide adequate notice to the unaccompanied child of the scheduling of his removal proceedings, the immigration judge granted four continuances. *Id.* at

274. At the fifth hearing, after the unaccompanied child still did not

show up, the immigration judge administratively closed the removal

proceedings. *Id.*

276. The set of facts at play in *Castro-Tum* have absolutely nothing to do

with administratively closing removal proceedings to allow an

individual who has shown up for their hearings to apply for a

provisional unlawful presence waiver before DHS.

277. The Attorney General abused his discretion by using the obscure and

nonapplicable facts of *Castro-Tum* to issue a rule by adjudication that

explicitly disallowed immigration judges and the Board of

Immigration Appeals from administratively closing cases to allow

individuals to apply for provisional unlawful presence waivers on the

basis of a case (i.e., *Castro-Tum*) premised on facts that are wholly

unrelated to individuals who seek to administratively close their case

to apply for an immigration-related benefit outside of removal

proceedings in order to more swiftly and easily resolve the merits of

their immigration removal proceedings. *See* 27 I. & N. Dec. at 278

n.3, 287 n.9.

278. The Attorney General also abused his discretion by using an agency

adjudication (instead of informal rulemaking) to announce the rules

provided by *Castro-Tum* because the Attorney General had either

actual or constructive knowledge that informal rulemaking should have been used because the rules announced in *Castro-Tum* clearly constitute significant regulatory action under Executive Orders 12866 and 13653.

279.   The Executive Office for Immigration Review has abused its discretion by repeatedly relying on *Matter of Castro-Tum* to deny Plaintiffs' motions to administratively close their removal proceedings so that they may apply for a provisional unlawful presence waiver.

280.   Plaintiffs have filed motions with EOIR seeking administrative closure in which Plaintiffs challenged EOIR's interpretation that *Matter of Castro-Tum* operates to prevent administrative closure in Plaintiffs' removal cases.

281.   The regulations of 8 U.S.C. § 1003.10(b), 8 C.F.R. § 1003.1, 8 C.F.R. § 1240.1, 8 C.F.R. § 1003.9, and even 8 C.F.R. § 1003.12 all provide EOIR adjudicators with the discretion to administratively close removal proceedings for good cause.

282.   By applying *Matter of Castro-Tum* in a manner that disallows administrative closure for the good cause shown by Plaintiffs, EOIR adjudicators have abused their discretion by failing to exercise it in the first place. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67, 74 S. Ct. 499, 503, 98 L. Ed. 681 (1954) ("the Board

was required, as it still is, to exercise its own judgment when

considering appeals. The clear import of broad provisions for a final

review by the Attorney General himself would be meaningless if the

Board were not expected to render a decision in accord with its own

collective belief. In unequivocal terms the regulations delegate to the

Board discretionary authority as broad as the statute confers on the

Attorney General; the scope of the Attorney General's discretion

became the yardstick of the Board's. And if the word 'discretion'

means anything in a statutory or administrative grant of power, it

means that the recipient must exercise his authority according to his

own understanding and conscience. This applies with equal force to

the Board and the Attorney General. In short, as long as the

regulations remain operative, the Attorney General denies himself

the right to sidestep the Board or dictate its decision in any manner.

We think the petition for habeas corpus charges the Attorney General

with precisely what the regulations forbid him to do: dictating the

Board's decision.").

283.   Defendant Ryan R. Wood, Assistant Chief Immigration Judge for the

Fort Snelling, Minnesota immigration court, has likewise abused his

discretion by instructing, encouraging, or training immigration judges

at the Fort Snelling, Minnesota immigration court to deny motions to

administratively close proceedings filed by individuals who seek to apply for provisional unlawful presence waivers on the basis of *Matter of Castro-Tum*, 27 I. & N. Dec. 271.

284. For all of the aforementioned reasons, Plaintiffs submit that Defendants' decision to promulgate the rules announced in *Matter of Castro-Tum* via agency adjudication instead of through informal rulemaking constitutes an abuse of discretion by Defendants; Plaintiffs challenge Defendants' reliance on *Matter of Castro-Tum* as a proper basis for denying Plaintiffs' motions to administratively close proceedings and allege that this reliance constitutes an abuse of discretion.

## *A Class Action May Be Maintained*

285. Plaintiffs represent a class of persons that is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23 (a)(1).

286. Specifically, Plaintiffs assert membership in a class of persons in which members are all individuals who:

**(1)** are in removal proceedings under the jurisdiction of the immigration court located in Fort Snelling, Minnesota;

**(2)** are the beneficiary of an approved immediate relative petition (Form I-130);

**(3)** are currently married to a U.S. citizen or lawful permanent

resident;

**(4)** are ineligible to apply for a provisional unlawful presence waiver because their removal proceedings are not administratively closed;

**(5)** are otherwise eligible to apply for a provisional unlawful presence waiver; and

**(6)**

> **(a)** have already submitted a motion to administratively close proceedings with EOIR in order to apply for a provisional unlawful presence waiver; or
>
> **(b)** will submit a motion to administratively close proceedings with EOIR in order to apply for a provisional unlawful presence waiver.

287.  The questions of law or fact which Plaintiffs present are common to the class of which Plaintiffs are representatives. *See* Fed. R. Civ. P. 23(a)(2).

288.  Plaintiffs' claims are typical of the claims of the class of which Plaintiffs are representatives. *See* Fed. R. Civ. P. 23(a)(3).

289.  Plaintiffs will fairly and adequately protect the interests of the class of which Plaintiffs are representatives. *See* Fed. R. Civ. P. 23(a)(4).

290.  Prosecuting separate actions by Plaintiffs, or by individual class members of the class which Plaintiffs represent, will create a risk of

inconsistent or varying adjudications with respect to individual class members which will establish incompatible standards of conduct for Defendants. *See* Fed. R. Civ. P. 23(b)(1)(A).

291. Prosecuting separate actions by Plaintiffs, or by individual class members of the class which Plaintiffs represent, will create a substantial risk of adjudications with respect to individual class members that, as a practical matter, will be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. *See* Fed. R. Civ. P. 23(b)(1)(B).

292. By relying on *Castro-Tum* to deny Plaintiffs' motions to administratively close their removal proceedings, Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. *See* Fed. R. Civ. P. 23(b)(2).

293. Questions of law and fact common to class members predominate over any questions affecting only individual members. *See* Fed. R. Civ. P. 23(b)(3).

294. Illustratively, the Attorney General's decision in *Castro-Tum* denies class members the opportunity to apply for a provisional unlawful

presence waiver and thus arbitrarily and capriciously prevents class

members from obtaining immigrant visas which Congress and the

Department of Homeland Security—through its passing of the

legislation that created 8 U.S.C. § 1182(a)(9)(B)(v) and 8 C.F.R. §

212.7(e)(4)(iii)—intended to make available to class members that are

able to meet their burden of demonstrating that: (1) they are eligible

for a provisional unlawful presence waiver; (2) they are otherwise

deserving of discretion; and (3) good cause exists for allowing the

potential applicant to proceed with an application for a provisional

unlawful presence waiver outside of the immigration courts.

295.  A class action is superior to other available methods for fairly and

efficiently adjudicating the controversy in question. *See* Fed. R. Civ.

P. 23(b)(3).

296.  Plaintiffs have no meaningful interest in individually controlling the

prosecution of the actions alleged in this Complaint in separate

individual actions. *See* Fed. R. Civ. P. 23(b)(3)(A).

297.  To the best of Plaintiffs' knowledge, there is little or no pending

litigation concerning the controversy begun by class members. *See*

Fed. R. Civ. P. 23(b)(3)(B).

298.  It is desirable to concentrate the litigation of all of the claims of class

members in this particular forum because doing so will prevent

unnecessary duplication of efforts, will preserve the judicial economy,

will save class members a significant amount of money in legal fees,

and will ensure that all class members and Defendants are

adequately represented by competent counsel. *See* Fed. R. Civ. P.

23(b)(3)(C).

299.   It is also desirable that litigation of Plaintiffs' claims be concentrated

in this particular forum because, as of December 2019, the

immigration court in Fort Snelling, Minnesota had 13,581 pending

cases, most of which are removal proceedings.

300.   The immigration court in Fort Snelling, Minnesota has jurisdiction

over the removal proceedings of class members who live in Minnesota,

North Dakota, or South Dakota, meaning that concentrating the

claims will prevent the need for duplicative litigation in additional

forums while simultaneously ensuring that Defendants cannot treat

class members differently based on their state of residence.

301.   Concentrating litigation in this forum is also desirable because the

pending backlog of the immigration court in Fort Snelling, Minnesota

has increased from 8,015 cases in Fiscal Year 2018 to 13,175 cases in

Fiscal Year 2020 (as of March 31, 2020); a large part of this backlog

can be reversed if class members are allowed to administratively close

proceedings to seek provisional unlawful presence waivers, allowing

them to consular process into the United States and thus complete their removal proceedings while concomitantly decreasing the backlog of the Fort Snelling, Minnesota immigration court.

302.   Additionally, there are many individuals in Minnesota, North Dakota, and South Dakota who are similarly situated to Plaintiffs and who fall within the ambit of the class; a judgment in favor of Plaintiffs which does not also apply to these similarly situated individuals will constitute a manifest injustice to other similarly situated individuals who fall within the ambit of the class.

303.   There are many individuals in Minnesota, North Dakota, and South Dakota who are similarly situated to Plaintiffs and who fall within the ambit of the class; a judgment in favor of Defendants which does not also apply to these similarly situated individuals will constitute a manifest injustice to Defendants by allowing other similarly situated individuals who fall within the ambit of the class to file numerous duplicative lawsuits which Defendants will be forced to defend.

304.   There are no likely difficulties in managing a class action. *See* Fed. R. Civ. P. 23(b)(3)(D).

305.   Because no monetary damages are sought (only an award of attorney fees and costs), class members will not struggle to agree or disagree

on a settlement and it is highly unlikely that any class members will

choose to opt out of the class.

306.  Class members do not benefit by a partial victory, and are

incentivized to only settle this case if settling means that Defendants

will administratively close Plaintiffs' removal proceedings or

otherwise be willing to adjudicate class members' motions to

administratively close their proceedings under the same standard

used to adjudicate such motions prior to the Attorney General's

issuance of *Matter of Castro-Tum*.

307.  If Plaintiffs are certified as a class but lose on the merits of their

claim, their individual interests will not be harmed because they will

be in the same position after the lawsuit as they are prior to class

certification.

308.  The issues of fact and law common to each class member are basic

and are not the sorts of issues of fact or law that are likely to present

difficulty in determining whether a specific individual is a class

member.

## IRREPARABLE INJURY

309.  It is well established that deprivation of constitutional rights

constitutes "irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373-

74, 96 S. Ct. 2673, 2690, 49 L. Ed. 2d 547 (1976); *Planned Parenthood*

*of Minnesota, Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977).

310.   When an alleged deprivation of constitutional rights is involved, no further showing of irreparable injury is necessary. *Planned Parenthood of Minnesota*, 558 F.2d at 867 (citing 11 C. Wright & A. Miller, *Federal Practice & Procedures: Civil* § 2948 at 439 (1973)).

311.   When an agency fails to comply with its own regulations, due process is violated and irreparable injury exists. *See, e.g.*, *Montilla v. I.N.S.*, 926 F.2d 162, 169 (2d Cir. 1990) (violation of regulations constitutes a violation of due process); *Waldron v. I.N.S.*, 17 F.3d 511, 517 (2d Cir. 1993); *Leslie v. Attorney Gen. of U.S.*, 611 F.3d 171, 180 (3d Cir. 2010) ("we hold that when an agency promulgates a regulation protecting fundamental statutory or constitutional rights of parties appearing before it, the agency must comply with that regulation. Failure to comply will merit invalidation of the challenged agency action without regard to whether the alleged violation has substantially prejudiced the complaining party."); *Matter of Garcia-Flores*, 17 I. & N. Dec. 325 (BIA 1980) (holding that the violation of a regulatory requirement invalidates a proceeding where the regulation provides a benefit to the noncitizen and the violation prejudiced the interest of the noncitizen which was to be protected by the regulation).

312.   Plaintiffs will suffer irreparable injury if they are disallowed from applying for a provisional unlawful presence waiver which, in turn, will prevent Plaintiffs from being eligible to obtain an immigrant visa for a minimum of ten years from the date they depart the United States.

313.   If Plaintiffs are unable to administratively close their cases, they will be deported from the United States if they are unable to show that they are eligible for and deserving of some other sort of immigration-related relief available to persons in immigration court proceedings.

314.   Because Plaintiffs are being unnecessarily subjected to protracted removal proceedings, Plaintiffs are likely to incur unnecessary costs that accompany retaining lawyers and/or which result from mandatory filing fees for other immigration-related applications.

315.   Plaintiffs have experienced, or are likely to experience, unnecessary but extreme emotional distress as a result of being subjected to deportation proceedings which threatens to tear their families apart; this could be easily avoided by administratively closing Plaintiffs' removal cases in order to allow them to apply for provisional unlawful presence waivers.

316.   Plaintiffs' families, consisting of U.S. citizens and legal permanent residents, are also suffering as a result of Defendants' unlawful

actions; they are forced to contemplate losing their parent or child whose presence is essential for the family to survive and thrive.

317.  If Plaintiffs are deported because they are not allowed to administratively close their removal proceedings to apply for a provisional unlawful presence waiver, Plaintiffs and their spouses will be deprived of the opportunity to live with their spouse in the United States, which is arguably a liberty interest. *See Kerry v. Din*, 576 U.S. 86, 135 S. Ct. 2128, 2142-43, 192 L. Ed. 2d 183 (2015) (Breyer, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan) (three justices rejected Justice Breyer's argument, *see* 135 S. Ct. at 2135-36 (Scalia, joined by Roberts and Thomas), and two Justices assumed without deciding the issue that U.S. citizens have such a right, *see* 135 S. Ct. at 2139 (Kennedy, joined by Alito)).

318.  Plaintiffs will be denied due process of law and equal protection of the law, and will thus be irreparably injured, if they are disallowed from applying for a provisional unlawful presence waiver on the basis of a legislative rule announced in *Matter of Castro-Tum* which did not comply with the Administrative Procedure Act's notice-and-comment requirements.

319.  Plaintiffs will be denied due process of law and equal protection of the law, and will thus be irreparably injured, if Defendant EOIR is

permitted to abuse its discretion by denying Plaintiffs' motions to administratively close Plaintiffs' removal proceedings so that they may apply for provisional unlawful presence waivers.

320. Plaintiffs will be denied due process and equal protection of the law if the Attorney General and EOIR Defendants are permitted to adopt a rule by agency adjudication which effectively removes from the Secretary of Homeland Security the sole authority to interpret 8 U.S.C. § 1182(a)(9)(B)(v) and which effectively alters the language of regulations promulgated by the Secretary of Homeland Security.

321. Plaintiffs will be denied equal protection of the law if they are disallowed from applying for a provisional unlawful presence waiver simply because they are in removal proceedings when persons who have been ordered removed (and thus are not in removal proceedings) are allowed to apply for a provisional unlawful presence waiver. There is no conceivable rational basis for this distinction and concomitant discrimination.

322. In short, Plaintiffs will be denied their constitutional rights if Defendants' unlawful actions are not set aside or otherwise unwound. This constitutes irreparable injury.

## **EXHAUSTION**

323.   Plaintiffs have exhausted their administrative remedies as required by law. No relevant statute mandates an administrative interlocutory appeal and there are no further administrative remedies that Plaintiffs can seek.

324.   The issues presented herein do not relate to final orders of removal; Plaintiffs do not have final orders of removal and are thus ineligible to seek review in the Eighth Circuit Court of Appeals pursuant to 8 U.S.C. § 1252.

325.   Plaintiffs seek judicial review of agency action for which there is no other adequate remedy.

326.   Although Defendants' refusal to administratively close proceedings might be construed as preliminary, procedural, or intermediate agency action, the context of this case demands treating Defendants' actions as final under the collateral order doctrine.

327.   By refusing to grant Plaintiffs' motion for administrative closure, Plaintiffs are foreclosed from applying for a discretionary form of relief regardless of whether Plaintiffs merit a positive exercise of discretion.

328.   As such, the agency's action implicates the collateral order doctrine and constitutes a final judgment.

329.   Even if Plaintiffs did choose to file an interlocutory appeal to the BIA in order to more fully exhaust their administrative remedies, the BIA lacks the authority to address the issue because the BIA cannot overrule the Attorney General.

330.   Moreover, when an interlocutory appeal is filed, it does not stay the decision being appealed and the Board of Immigration Appeals is free to dismiss the interlocutory appeal.

331.   Any interlocutory appeal from a decision to deny Plaintiffs' motions to administratively close their removal proceedings would be futile.

332.   Additionally, the heart of Plaintiffs' claims relate to whether the Attorney General improperly violated the notice-and-comment requirements of section 553 of the Administrative Procedure Act and whether EOIR Defendants have committed legal error by adopting a pattern or practice of improperly relying on a legislative rule announced via an agency adjudication.

333.   Plaintiffs cannot appeal this issue to any other court.

334.   Plaintiffs are not required to first request that the Secretary of Homeland Security publish a proposed regulation in order to later challenge the Secretary's failure to issue a proposed regulation.

## CLAIMS FOR RELIEF

335.  All of the foregoing allegations are re-alleged and incorporated by reference.

336.  In order to understand what relief Plaintiffs seek, it is worth first clarifying that Plaintiffs do <u>not</u> seek any order that would compel Defendants to grant a provisional unlawful presence to any individual. Plaintiffs simply seek the opportunity to apply for the provisional unlawful presence waiver. Plaintiffs are currently being arbitrarily, capriciously, and unlawfully denied this opportunity.

337.  Plaintiffs request relief on the following grounds:

### Count 1: Administrative Procedure Act – Rulemaking

338.  Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-337 *supra* and paragraphs, 348-503 *infra*.

339.  The Attorney General violated 5 U.S.C. § 553 (the Administrative Procedure Act) on May 18, 2018 by promulgating legislative rules through an agency adjudication (*Matter of Castro-Tum*, 27 I. & N. Dec. 271) without following the rulemaking process mandated by statute.

340.  The rules promulgated by the Attorney General in *Matter of Castro-Tum* are substantive.

341.   Even if the rules promulgated by the Attorney General in *Matter of Castro-Tum* are not of a legislative character, the Attorney General still abused his discretion by announcing these rules by agency adjudication rather than through informal rulemaking.

342.   Defendants' agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

343.   Defendants' agency action was contrary to constitutional right, power, privilege, or immunity.

344.   Defendants' agency action was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

345.   Defendants' agency action was without observance of procedure required by law.

346.   Defendants' agency action was unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute.

347.   Defendants' agency action was unwarranted by the facts to the extent that the facts are subject to trial de novo review by the reviewing court.

**Count 2: Administrative Procedure Act – Pattern or Practice**

348. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-347 *supra* and paragraphs, 362-503 *infra.*

349. The Attorney General has adopted an unlawful pattern or practice of directing the Board of Immigration Appeals to refer cases to the Attorney General despite the Board's belief that such cases should not be referred to the Attorney General. *Infra.*

350. The Attorney General's precedential *Matter of Castro-Tum* decision is beyond the Attorney General's statutory and regulatory authority and is thus ultra vires. *Infra.*

351. Because *Matter of Castro-Tum* is ultra vires, it cannot be relied upon by EOIR Defendants to deny Plaintiffs' motions to administratively close their removal proceedings.

352. EOIR Defendants have adopted an unlawful pattern or practice of relying on *Castro-Tum* as the justification for denying Plaintiffs' motions to administratively close their removal proceedings despite *Matter of Castro-Tum* being the result of an ultra vires exercise of authority by the Attorney General.

353. EOIR Defendants have adopted an unlawful pattern or practice of abusing their discretion by relying on *Castro-Tum* to refuse to exercise

their discretion to decide motions and controversies in the same manner that was ruled unlawful in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67, 74 S. Ct. 499, 503, 98 L. Ed. 681 (1954).

354.   EOIR Defendants have adopted an unlawful pattern or practice of impermissibly circumscribing their own discretion to administratively close cases for individuals who are otherwise eligible to apply for and who wish to apply for a provisional unlawful presence waiver.

355.   EOIR Defendants have adopted an unlawful pattern or practice of disregarding and disclaiming EOIR's regulatory authority—granted to them by, *inter alia*, 8 C.F.R. § 1003.1, 8 C.F.R. §§ 1003.9, 1003.10(b), 8 C.F.R. § 1240.1, 8 C.F.R. § 1240.6, and implicitly granted to them by 8 C.F.R. § 212.7(e)(4)(iii)—to administratively close removal proceedings in order to apply otherwise eligible individuals to apply for a provisional unlawful presence waiver. *See also Matter of Avetisyan*, 25 I. & N. Dec. 688 (BIA 2012); *Matter of W-Y-U-*, 27 I. & N. Dec. 17 (BIA 2017).

356.   Defendants' agency actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

357.   Defendants' agency action was contrary to constitutional right, power, privilege, or immunity.

358.   Defendants' agency action was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

359.   Defendants' agency action was without observance of procedure required by law.

360.   Defendants' agency action was unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute.

361.   Defendants' agency action was unwarranted by the facts to the extent that the facts are subject to trial de novo review by the reviewing court.

## Count 3: Administrative Procedure Act – Statutory Authority

362.   Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-361 *supra* and paragraphs, 394-503 *infra*.

363.   The Attorney General's precedential *Matter of Castro-Tum* decision is beyond the Attorney General's statutory and regulatory authority and is thus ultra vires.

364.   The Attorney General invoked 8 U.S.C. § 1103(g)(2) and 8 C.F.R. § 1003.1(h)(1)(i) as the authority that allowed him to issue *Matter of Castro-Tum*.

365.  Plaintiffs allege that 8 C.F.R. § 1003.1(h)(1)(i) is an unreasonable interpretation of 8 U.S.C. § 1103(g) and thus ultra vires to the Attorney General's statutory authority.

366.  Plaintiffs allege that 8 C.F.R. § 1003.1(h)(1)(i) is an invalid regulatory provision because it conflicts with 8 C.F.R. §§ 1003.1(a), (d)(1)(ii), (d)(4), (h)(1)(ii).

367.  More specifically, 8 C.F.R. § 1003.1(a)(1) provides that the Board of Immigration Appels is subject to the "general supervision of the Director" of EOIR. Although the Attorney General is allowed to appoint delegates to the Board, there is no mention of the Attorney General having the authority to generally supervise the Board.

368.  8 C.F.R. § 1003.1(a)(2) provides that the Attorney General may designate one individual of the Board as a Chairman (who is subject to the authority of the Director of EOIR) and may designate one or two individuals as Vice Chairman. The Chairman is expressly imbued with the authority to "Direct the conduct of all employees assigned to the Board to ensure the efficient disposition of all pending cases, including the power, in his discretion, to set priorities or time frames for the resolution of cases; to direct that the adjudication of certain cases be deferred, to regulate the assignment of Board members to cases, and otherwise to manage the docket of matters to be decided by

the Board." 8 C.F.R. § 1003.1(a)(2)(i)(C). There is no mention of the Attorney General having the authority to generally supervise or overrule the Chairman (unless, of course, the Attorney General passes a regulation in accordance with the rulemaking procedures of 5 U.S.C. § 553).

369. 8 C.F.R. § 1003.1(d) provides that the Board "**shall** function as an appellate body **charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it** [(i.e., adjudications mentioned in 8 U.S.C. § 1103(g)(2))]. The Board **shall** resolve the questions before it in a manner that is **timely, impartial, and consistent** with the Act and regulations." 8 C.F.R. § 1003.1(d)(1) (emphasis added).

370. This provision expressly delegates to the Board (without reservation) the Attorney General's power to "review such administrative determinations in immigration proceedings," granted to the Attorney General by 8 U.S.C. § 1103(g)(2), and demands impartiality and acting in accordance with the INA. 8 C.F.R. § 1003.1(d)(1). It is unclear why the Attorney General should have the power to force the Board to refer cases to himself after the Board impartially decided the case in a manner consistent with the INA.

371.   8 C.F.R. § 1003.1(d)(1) also explicitly instructs that the Board,
       "through precedent decisions, **shall** provide clear and uniform
       guidance to the Service, the immigration judges, and the general
       public on the proper interpretation and administration of the Act **and
       its implementing regulations**." *Id.* (emphasis added).

372.   This provision expressly delegates to the Board (without reservation)
       the Attorney General's power to provide agency guidance through
       agency adjudications and the publication of precedential decisions
       from such agency adjudications. When the Board has fulfilled this
       role, it is unclear why the Attorney General should have the power to
       force the Board to refer cases to the Attorney General after the Board
       issues a decision (which provides the proper interpretation and
       administration of the INA and related regulations) in order to
       overturn the Board's guidance simply because the Attorney General
       would prefer a different result in the agency adjudication.

373.   Moreover, because the Board has the authority to issue precedential
       decisions, the Board also necessarily has the authority not to issue a
       precedential decision. *See* 8 C.F.R. § 1003.1(d)(1). When the Board
       issues a nonprecedential decision and the Attorney General orders the
       Board to certify the case to the Attorney General in order to expand
       the decision and make it precedential, such action impinges the

Board's authority to *not* issue a new interpretive rule through the official publication of an agency's decision following an agency adjudication.

374.   8 C.F.R. § 1003.1(d)(1)(ii) also explicitly provides that "Board members **shall** exercise their <u>independent</u> **judgment and discretion in considering and determining the cases coming before the Board**, and a panel or Board member to whom a case is assigned may take any action consistent with their authorities under the Act and the regulations **as is appropriate and necessary for the disposition of the case**." 8 C.F.R. § 1003.1(d)(1)(ii) (emphasis added).

375.   When the Board has exercised their independent judgment and discretion in considering and determining a case (such as the appeal in *Castro-Tum*), and when the Board has determined in the exercise of their independent judgment and discretion that the case should not be referred to the Attorney General, and when the Board has determined that the case should not be published as a precedential decision, there is no reason to allow the Attorney General to interfere with this decision by kingly decree. By allowing the Attorney General to compel the Board to refer such cases to the Attorney General, despite every indication that the Board believes doing so is inappropriate, the

Attorney General enslaves the Board in a manner that undermines the Board's integrity and quasi-judicial functions. Such actions by the Attorney General arise from the Attorney General asserting dictatorial powers to forcibly guide, and thus dictate, the Board's decision on a variety of matters delegated to the Board by regulation.

376. 8 C.F.R. § 1003.1(d)(4) provides that the Board (not the Attorney General) "shall have the authority, with the approval of the Director" of EOIR (again, not the Attorney General) "to prescribe procedures governing proceedings before it." If the Attorney General wishes to change these procedures, he must do so by legislative rulemaking which complies with the requirements of 5 U.S.C. § 553.

377. In *Castro-Tum*, the Attorney General dictated the Board's exercise of discretion, decided a variety of matters broader than the facts of the case presented, imposed new rules of procedure which the Chairman of the Board and Director of EOIR did not deem necessary and which substantively affect Plaintiffs' constitutional and statutory rights, improperly ordered the Board to certify a case to the Attorney General, and otherwise deprived the agency adjudication at issue in *Castro-Tum* of any veneer of impartiality. These ultra vires actions of the Attorney General, and the concomitant consequences that flow from such ultra vires actions, provide the sole justification for

Defendants' denials of Plaintiffs' motions to administratively close their removal proceedings.

378. The Attorney General's use of 8 C.F.R. § 1003.1(h)(1)(i) power is especially concerning (and appears to be patently unlawful) in instances where the Attorney General directs the Board to refer a case to the Attorney General despite the fact that neither the Chairman of the Board nor the majority of the Board believe that the case should be referred to the Attorney General. *See* 8 C.F.R. § 1003.1(h)(1)(ii) (compelling the Board or Chairman to refer to the Attorney General *all* cases which *either* the Chairman *or* a majority of the Board believe should be referred to the Attorney General).

379. While the Board of Immigration Appeals does possess special expertise as to immigration matters, there is no reason to believe the same is true, with regards to immigration matters, for the Attorney General. The Attorney General is necessarily a generalist who relies on the agency's experts (which is why the Attorney General delegated his powers to the agency experts in the first place) and it is inappropriate for the Attorney General to intervene in cases, and publish precedential decisions as a result of this intervention, when the experts do not believe that such intervention is necessary.

380. Because *Matter of Castro-Tum* is ultra vires, it cannot be relied upon by Defendants to deny Plaintiffs' motions to administratively close their removal proceedings.

381. The Attorney General has acted outside of his statutory authority by issuing a precedential decision (i.e., *Matter of Castro-Tum*) which restricts the Secretary of Homeland Security's interpretation of 8 U.S.C. § 1182(a)(9)(B)(v) by limiting the persons who are eligible to apply for provisional unlawful presence waivers to individuals not in removal proceedings. *See generally* 6 U.S.C. § 271; 6 U.S.C. § 557; 8 U.S.C. § 1182(a)(9)(B)(v); 8 C.F.R. § 212.7(e). This decision has been presumed by EOIR Defendants to be lawful and has thus been relied upon by EOIR Defendants as grounds for denying Plaintiffs' motions to administratively close their removal proceedings.

382. The Attorney General has adopted an unlawful pattern or practice of directing the Board to refer cases to the Attorney General despite the Board's belief that such cases should not be referred to the Attorney General.

383. The Attorney General has adopted an unlawful pattern or practice of using his referral and review power, under 8 C.F.R. § 1003.1(h)(1)(i) specifically, to pronounce new rules (legislative or otherwise) which

are not contemplated by or relevant to the facts of the case used by the Attorney General to announce such rules.

384.  EOIR Defendants have adopted an unlawful pattern or practice of relying on *Castro-Tum* as the sole justification for denying Plaintiffs' motions to administratively close their removal proceedings despite *Matter of Castro-Tum* being the result of an ultra vires exercise of authority by the Attorney General.

385.  EOIR Defendants have adopted an unlawful pattern or practice of relying on *Castro-Tum* to refuse to exercise their discretion to decide motions and controversies in the same manner that was ruled unlawful in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67, 74 S. Ct. 499, 503, 98 L. Ed. 681 (1954).

386.  EOIR Defendants have adopted an unlawful pattern or practice of impermissibly circumscribing their own discretion to administratively close cases for individuals who are otherwise eligible to apply for and who wish to apply for a provisional unlawful presence waiver.

387.  EOIR Defendants have adopted an unlawful pattern or practice of disregarding and disclaiming EOIR's regulatory authority—granted to EOIR by 8 C.F.R. § 1003.1, 8 C.F.R. §§ 1003.9, 1003.10(b), 8 C.F.R. § 1240.1, 8 C.F.R. § 1240.6, and implicitly granted to EOIR by 8 C.F.R. § 212.7(e)(4)(iii)—to administratively close removal proceedings in order

to allow otherwise eligible individuals to apply for a provisional

unlawful presence waiver. *See also Matter of Avetisyan*, 25 I. & N. Dec.

688 (BIA 2012); *Matter of W-Y-U-*, 27 I. & N. Dec. 17 (BIA 2017).

388.   Defendants' agency action was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.

389.   Defendants' agency action was contrary to constitutional right, power,

privilege, or immunity.

390.   Defendants' agency action was in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right.

391.   Defendants' agency action was without observance of procedure

required by law.

392.   Defendants' agency action was unsupported by substantial evidence in

a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the

record of an agency hearing provided by statute.

393.   Defendants' agency action was unwarranted by the facts to the extent

that the facts are subject to trial de novo review by the reviewing

court.

## Count 4: Administrative Procedure Act – Abuse of Discretion

394.   Plaintiffs reallege and incorporate by reference, as if fully set forth

herein, the allegations in paragraphs 1-393 *supra* and paragraphs,

411-503 *infra.*

395.   The Attorney General abused his discretion by promulgating the rules announced in *Matter of Castro-Tum* through publication of a precedential decision arising from an agency adjudication instead of announcing these rules through the informal rulemaking process provided by 5 U.S.C. § 553.

396.   None of the rules announced in *Castro-Tum* were necessary to decide the individual case before the Attorney General.

397.   Even if it would have normally been proper for the Attorney General to announce the new rules first announced in *Castro-Tum* by agency adjudication (which Plaintiffs dispute), the Attorney General abused his discretion by doing so in a case in which no appearance had ever been made (personally or via counsel) by the individual whose name captions the case (i.e., Castro-Tum) because such a maneuver ensures that the individual at issue (i.e., Castro-Tum) will never file a petition for review, pursuant to 8 U.S.C. § 1252, to challenge the outcome of the case.

398.   By acting in the manner described in the preceding paragraph, the Attorney General ensured that a direct attack could not be made on his decision, relegating any potential challenges to collateral attacks which are necessarily harder to prosecute. This calculated action by the Attorney General is diabolical.

399. The Attorney General abused his discretion by using an agency
     adjudication to constrain the regulatory discretion of the agency
     adjudicators housed within the Executive Office for Immigration
     Review.

400. The Attorney General abused his discretion by issuing a variety of
     rules through an agency adjudication that were not contemplated by
     or relevant to the facts of the case in which such rules were
     announced.

401. The Attorney General abused his discretion by using an agency
     adjudication, rather than legislative rulemaking, to limit the
     authority of the Chairman of the Board granted by 8 C.F.R. §
     1003.1(a)(2)(i).

402. The Attorney General abused his discretion by using *Castro-Tum* to
     announce a much broader rule than was announced by the holding of
     the Board's underlying agency decision in *Matter of Castro-Tum*,
     A206-842-910 (BIA Nov. 27, 2017) (unpublished).

403. While it might have been proper for the Attorney General to designate
     the Board's panel decision in *Castro-Tum* as precedent, and thus
     establish that it is improper for immigration judges to
     administratively close proceedings to avoid issuing *in absentia*
     removal orders in situations in which the immigration judge

disbelieves (without any proof) that DHS might have failed to properly notify a noncitizen of the time or place of their removal proceedings, it was an abuse of discretion for the Attorney General to expand the Board's narrow holding to cover a huge cross-section of factual situations not contemplated by the Board in the case at hand. Rather than acting through piecemeal adjudications, as would be proper, the Attorney General issued a precedential (advisory) opinion and dressed it up as a fact-specific case-by-case inquiry in order to pull the wool over the eyes of future courts reviewing collateral challenges to *Castro-Tum*.

404.   EOIR Defendants have engaged in a pattern or practice of relying on *Castro-Tum* to refuse to exercise their discretion to decide motions and controversies in the same manner that was ruled unlawful in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67, 74 S. Ct. 499, 503, 98 L. Ed. 681 (1954).

405.   Defendants' agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

406.   Defendants' agency action was contrary to constitutional right, power, privilege, or immunity.

407.   Defendants' agency action was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

408.   Defendants' agency action was without observance of procedure required by law.

409.   Defendants' agency action was unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute.

410.   Defendants' agency action was unwarranted by the facts to the extent that the facts are subject to trial de novo review by the reviewing court.

## Count 5: Administrative Procedure Act – Inadequate Rationale

411.   Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-410 *supra* and paragraphs, 431-503 *infra.*

412.   The Supreme Court has provided that:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. **The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given."**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983) (citation omitted).

413. When *Castro-Tum*'s case was before the Board, the Board reversed the immigration judge's decision to administratively close the case, <u>not</u> because administrative closure is a non-permitted action by immigration judges, but rather because the immigration judge erred in administratively closing the removal proceedings where the respondent failed to appear and where DHS submitted relevant and probative evidence to support its motion for an in absentia order of removal. *Matter of Castro-Tum*, A206-842-910 at *2 (BIA Nov. 27, 2017) (unpublished).

414. In turn, the Attorney General ordered the Board to refer *Castro-Tum* to the Attorney General so that the Attorney General could consider the wholly unrelated questions of, *inter alia*: (1) "Are there any circumstances where a docket management device other than administrative closure--including a continuance for good cause shown (8 C.F.R. § 1003.29 (2017)), dismissal without prejudice (8 C.F.R. § 1239.2(c) (2017)), or termination without prejudice (8 C.F.R. § 1239.2(f))--would be inadequate to promote that objective?"; and (2) "Should there be different legal consequences, such as eligibility to

apply for a provisional waiver of certain grounds of inadmissibility under the immigration laws or for benefits under federal or state programs, where a case has been administratively closed rather than continued?" 27 I. & N. Dec. 187, 187 (Jan. 4, 2018).

415. The second question considered by the Attorney General directly usurps the Secretary of Homeland Security's sole discretion to determine who is eligible to apply for a provisional unlawful presence waiver under 8 U.S.C. § 1182(a)(9)(B)(v). *See* 6 U.S.C. § 271; 6 U.S.C. § 557; *Silva v. United States*, 866 F.3d 938, 940 n.2 (8th Cir. 2017) (In light of legislation transferring functions of the former Immigration and Naturalization Service to the Department of Homeland Security, 6 U.S.C. §§ 202, 251, 557, the statutory reference to "Attorney General" now means the "Secretary of the Department of Homeland Security.") (citations omitted).

416. By enacting The Homeland Security Act of 2002, including but not limited to: 6 U.S.C. § 112, 6 U.S.C. § 251, 6 U.S.C. § 271, 6 U.S.C. § 521, and 6 U.S.C. § 557, Congress expressly evidenced that it did not intend for the Attorney General to consider who should and should not be eligible for a waiver of inadmissibility pursuant to 8 U.S.C. § 1182(a)(9)(B)(v).

417.   The Attorney General's interpretation of 8 U.S.C. § 1182(a)(9)(B)(v) is irrelevant because the Attorney General has no discretion or statutory authority to determine who is eligible for such a waiver of inadmissibility unless the Secretary of Homeland Security has delegated the authority to grant such a waiver to the Attorney General.

418.   The Secretary of Homeland Security has not delegated to the Attorney General the discretion to determine who is eligible to apply for a provisional unlawful presence waiver pursuant to 8 U.S.C. § 1182(a)(9)(B)(v). *See* 8 C.F.R. § 212.7(e)(1) ("USCIS has exclusive jurisdiction to grant a provisional unlawful presence waiver under this paragraph (e). A [noncitizen] applying for a provisional unlawful presence waiver must file with USCIS the form designated by USCIS, with the fees prescribed in 8 CFR 103.7(b), and in accordance with the form instructions.").

419.   The Attorney General's decision to consider, as a principal basis of its *Castro-Tum* decision, whether there should be different legal consequences, such as eligibility to apply for a provisional unlawful presence waiver, "where a case has been administratively closed rather than continued" evidences that the Attorney General acted arbitrarily in rescinding the earlier rule allowing for administrative closure

without any consideration of the costs and benefits of administrative

closure or of the costs of benefits of any alternatives to ending the

practice of administrative closure. *See* 463 U.S. at 43, 103 S. Ct. at

2867.

420.   Once the Attorney General had reached a decision and promulgated

*Matter of Castro-Tum*, the Attorney General provided additional

reasoning for his decision. *See* 27 I. & N. Dec. 271.

421.   In *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018), the Attorney

General provided the following reasons for his decision and the rules

issued therein:

**(1)** "Because the case comes off the active docket, the immigration

judge no longer tracks it, and EOIR does not count the case as active

in assessing backlogs in immigration proceedings." 27 I. & N. Dec. at

273.

**(2)** "Administratively closed cases are also difficult to recalendar." *Id.*

**(3)** "[T]he [noncitizen] respondent in most cases has few incentives to

seek to recalendar." *Id.*

**(4)** "[A]dministrative closure encumbers the fair and efficient

administration of immigration cases." *Id.*; *see also id.* at 289 n.10.

**(5)** "DHS represents that this certified case is one of nearly 200

decisions between April 2017 and December 2017 in which an

immigration judge either ordered administrative closure or refused to recalendar an administratively closed case over DHS's objection." *Id.* at 274.

**(6)** "Congress has never authorized administrative closures in a statute, and Department of Justice regulations only permit administrative closure in specific categories of cases." *Id.*

**(7)** "The Attorney General has never delegated the general authority, and I decline to do so now." *Id.*

**(8)** "[R]egulations limit administrative closure authority to specific categories of cases, but do not delegate the general authority to authorize administrative closure." *Id.* at 278.

**(9)** "[A]djudication presents a more efficient, but equally thorough, means of considering the legal basis for the practice of administrative closure" than does rulemaking. *Id.* at 282.

**(10)** "[T]he Board is 'a regulatory creature of the Attorney General, to which he has delegated much of his authority under the applicable statutes.'" *Id.* at 283 (quoting *I.N.S. v. Doherty*, 502 U.S. 314, 327, 112 S. Ct. 719, 726, 116 L. Ed. 2d 823 (1992)).

**(11)** Administrative closure does not allow for EOIR adjudicators to timely resolve the questions before them. *See* 27 I. & N. Dec. at 284, 285.

**(12)** "Grants of general authority to take measures "appropriate and necessary for the disposition of such cases" would not ordinarily include the authority to suspend such cases indefinitely." *Id.* at 285.

**(13)** Neither 8 C.F.R. § 1003.9 nor 8 C.F.R. § 1003.1 "grant . . . express authority to administratively close cases, and cannot reasonably be interpreted to implicitly delegate such authority." *Id.* at 286.

**(14)** "Interpreting the existing regulations to provide a general authority to grant administrative closure would also make the specific delegations that Attorneys General have made in this area largely superfluous." *Id.* at 287.

**(15)** "There would be no need to provide that immigration judges 'may' administratively close specific cases if they already possessed the discretionary power to do so." *Id.* at 288.

**(16)** There is a "strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *Id.* at 290 (citation and internal quotes omitted).

**(17)** "Delay virtually always operates to the detriment of the government . . . Yet, 'an unreasonable delay in the resolution of the proceedings may operate to the detriment of [noncitizen]s by

preventing them from obtaining relief that can provide lawful status.'" *Id.* (citations omitted).

**(18)** "The fact that immigration judges and the Board have used administrative closure in a wide array of cases since the 1980s is also insufficient to establish the existence of that authority." *Id.* at 292.

**(19)** "Regulations already expressly authorize other mechanisms that serve the same functions, and those other mechanisms avoid many of the drawbacks of administrative closure." *Id.*

**(20)** "[S]tatistics maintained by EOIR show that at the end of Fiscal Year 2017, some 355,835 administratively closed cases had yet to be recalendared." *Id.* at 293.

422. The Attorney General's reasoning in *Castro-Tum* is insufficient, inadequate, and incapable of justifying the Attorney General's decision to announce the rules promulgated by *Castro-Tum* via agency adjudication; legislative rulemaking was required. Moreover, the reasons provided by the Attorney General for his decision in *Matter of Castro-Tum* are demonstrably false. Plaintiffs support these claims by rebutting each of the Attorney General's purported reasons for issuing *Castro-Tum*, in order of the preceding paragraph:

**(1)** The Attorney General can easily order the Director of EOIR to implement a mechanism to track administratively closed cases. The

fact that these cases are not tracked is largely due to the agency's ineptitude in enacting an adequate case management system which fits the needs of the agency. Moreover, with EOIR's recent adoption of e-filing, this concern appears to be outdated. This alternative to the rules announced in *Castro-Tum* would increase agency efficiency, decrease burden on noncitizens and their attorneys, and would decrease the burden on the immigration courts that will result from a mass-recalendaring (DHS is currently using their downtime during the COVID-19 pandemic to file motions to recalendar basically every administratively closed case without regards to the facts of the case).

**(2)** Administratively closed cases are not difficult to recalendar. Upon the filing of a motion by either party which shows good cause for recalendaring, the motion is recalendared. The Attorney General's suggestion that this poses a difficulty for DHS is laughable as immigration judges regularly recalendared cases prior to the issuance of *Castro-Tum* in cases in which DHS showed good cause for such recalendaring.

**(3)** The Attorney General's statement that "in most cases," a noncitizen has little incentive to recalendar a case evidences that in some cases, a noncitizen does have such an incentive. When a noncitizen in administratively closed removal proceedings applies for

a provisional unlawful presence waiver, they have an incentive to recalendar their case after receiving a decision on the application. If the waiver application was approved, the individual needs to recalendar their case in order to request voluntary departure because, if they leave the country without first recalendaring their case, this constitutes a self-deportation which means the individual will need a second waiver pursuant to 8 U.S.C. § 1182(a)(9)(A)(iii) and 8 C.F.R. § 212.2(j) before they are allowed to consular process back into the United States. Similarly, if the noncitizen's application for a provisional unlawful presence waiver is denied, they are then incentivized to recalendar their removal proceedings to apply for some other form of immigration relief available in removal proceedings such as cancellation of removal or asylum. Thus, the Attorney General's *Castro-Tum* decision ignored the subset of cases, which includes Plaintiffs' removal cases, in which noncitizens are incentivized to recalendar their own proceedings once they have been administratively closed. It is also worth mentioning that immigration judges often impose rules about when a noncitizen must file a motion to recalendar their case; if the noncitizen fails to comply with these orders, they can be denied discretionary forms of relief once the noncitizen's noncompliance is discovered.

**(4)** Administrative closure, *for the purpose of allowing a noncitizen to apply for a provisional unlawful presence waiver*, does not encumber the fair and efficient administration of removal proceedings, as Plaintiffs have shown. *Supra* ¶¶ 139-228, 233-34, 257-68 and accompanying footnotes.

**(5)** DHS' representation doesn't state whether or prove that DHS showed good cause for recalendaring. Often, in practice, motions to recalendar filed by DHS consist of one line with little to no argument or rationale for why the motion should be granted. When noncitizens file motions without any discernable rationale, they are also denied a matter of course. By indicating that it is error for immigration judges to only recalendar administratively closed cases if good cause for recalendaring can be shown, the Attorney General casts serious doubt on the competency of immigration judges and the Board of Immigration Appeals. Moreover, the Attorney General removes from immigration judges the power to adjudicate motions; this obviates the need of involving EOIR at all—why not just have DHS or the noncitizen simply check a box on a form and send it in to recalendar proceedings? Why is the motion necessary?

**(6)** The Attorney General's statement that Congress has never authorized administrative closure in statute assumes that Congress

can only authorize acts expressly. This flies in the face of a multitude

of canons of statutory interpretation which provide that statutes can

implicitly authorize a wide variety of actions. One such principle holds

that what a text includes is not only what is express but also what is

implicit. For example, when a text authorizes a certain act, it

implicitly authorizes whatever is a necessary predicate of that act.

When a regulation provides that an immigration judge

> shall exercise the powers and duties delegated to them by
> the Act and by the Attorney General through regulation.
> In deciding the individual cases before them, and subject
> to the applicable governing standards, immigration judges
> shall exercise their independent judgment and discretion
> and may take any action consistent with their authorities
> under the Act and regulations that is appropriate and
> necessary for the disposition of such cases,

the regulation necessarily provides the immigration judge with the

power and duty to administratively close removal proceedings if doing

so is consistent with their authorities under the INA and related

regulations so long as this is appropriate and necessary for the

disposition of such cases. In the case of Plaintiffs, Plaintiffs have

shown that administratively closing their removal proceedings to

allow them to apply for a provisional unlawful presence waiver is

appropriate and necessary (due to 8 C.F.R. § 212.7(e)(4)(iii)) and

otherwise consistent with their authorities under the INA and related

regulations. The fact that 8 C.F.R. § 1003.10(b) states that immigration judges may take "any action . . . ," the Attorney General's contention that this does not provide the implied power to administratively close removal proceedings for good cause is nonsense. Moreover, 8 C.F.R. § 1003.10(b) states that immigration judges may take "any action consistent with their authorities **under the Act and regulations** . . . ." (emphasis added). As such, the Attorney General cannot repeal powers granted by regulations by narrowly construing such powers through agency adjudication; if the Attorney General wants to amend the regulations, he needs to publish a proposed rule first.

**(7)** The Attorney General's contention that no Attorney General has ever delegated the authority to EOIR adjudicators to administratively close removal proceedings is preposterous. By promulgating 8 C.F.R. § 1003.1, 8 C.F.R. § 1003.9, 8 C.F.R. § 1003.10, and 8 C.F.R. § 1240.1, the Attorney General clearly delegated wide authority to the immigration judges and Board of Immigration Appeals to manage their dockets, administratively close proceedings when good cause is shown, and otherwise take the steps necessary to timely and fairly reach a conclusion of the removal proceedings. As the Attorney General notes in *Castro-Tum*, immigration removal cases have been

getting administratively closed since 1980. **In the nearly 40 years between the first case of administrative closure and the Attorney General's *Castro-Tum* decision, no courts or quasi-judicial agency bodies found that immigration judges lacked the authority to administratively close cases.** In fact, the Attorney General cites to a cornucopia of cases which hold that administrative closure is implicitly permitted by the broad regulations issued by the Attorney General. All of these cases, and a great many more not cited by the Attorney General, recognize that any interpretation of a regulatory corpus which utilizes a bright-line rule requiring express regulatory authorization for every conceivable agency action is unworkable; such a requirement would strangle the Attorney General by forcing the Attorney General to consider every possible outcome in every potential factual scenario while also requiring the Attorney General to promulgate permissive regulations (through the more involved notice-and-comment procedures used for informal rulemaking) for dealing with every conceivable factual scenario. By stating that the Attorney General has never delegated the authority to administratively close removal proceedings simply because such delegations have not been express, the Attorney General holds himself to an impossible standard. For example, noncitizens and

DHS regularly file a variety of motions in removal proceedings that are not expressly contemplated by the regulations (e.g., motion to advance a hearing date, motion for a decision, motions to substitute counsel, motions to withdraw as counsel, motions to remand, motions to suppress, motion for an extension, motion to waive respondent's appearance, motion to appear telephonically, motion for a closed hearing, motion to accept an untimely filing, motion to request an interpreter, motion for video testimony, motion for consolidation, motion for severance, motion to amend, etc.) and the Immigration Court Practice Manual expressly acknowledges that EOIR adjudicators have the authority to decide these motions *even though* there is no regulatory authority explicitly providing EOIR adjudicators with the authority to hear such motions. *See, e.g.*, § 5.11 Decisions, Imm. Ct. Pract. Man. 5.11. Simply by promulgating the broad regulations that delegated the vast majority of the Attorney General's powers conferred by 8 U.S.C. § 1103(g), the Attorney General has necessarily provided, by regulation, the power for immigration judges and the Board to administratively close removal proceedings for good cause.

**(8)** Regulations do not limit the authority to administratively close cases to certain instances. The regulations cited by the Attorney

General in *Matter of Castro-Tum* which explicitly allow for administrative closure in certain instances do not provide that administrative closure is not allowed in separate instances, and it would be odd to find such language anyway because that is not how regulations are typically drafted. The regulations cited by the Attorney General deal with specific concerns and they do not touch on whether administrative closure is proper for purposes of filing an application for a provisional unlawful presence waiver. Although the Attorney General seeks to construe prior regulatory delegations as narrowly as possible, he overdoes it and construes them so narrowly as to deprive the regulatory text of its essential meaning and force onto the regulatory text a meaning that the words of the regulation cannot bear.

**(9)** The Attorney General is correct in noting that adjudications are more efficient forms of pronouncing rules than is informal rulemaking, but the rest of his statement is incorrect. Adjudication does not and cannot provide an equally thorough means of considering the legal basis for the practice of administrative closure as does rulemaking. *See, e.g.*, 5 U.S.C. § 553; Exec. Order No. 12866; Exec. Order No. 13653; 44 U.S.C. §§ 3501 et seq. (Paperwork Reduction Act); 5 U.S.C. §§ 601 et seq. (Regulatory Flexibility Act); 2 U.S.C. §§ 1501 et seq.

(Unfunded Mandates Reform Act). Rulemaking requires compliance with a variety of other statutes and Executive Orders and requires interaction with the public so that the agency can best understand the effects its rule will have on the country. Had the Attorney General opted to proceed by rulemaking, as he should have, the rules in *Matter of Castro-Tum* would have been subjected to a cost-benefit analysis, and the agency would have had to look at other alternatives. Had this exercise been completed, the Attorney General would have likely promulgated regulations which, at the very least, carved out as permissible the ability for immigration judges to administratively close removal proceedings in order to allow individuals to apply for provisional unlawful presence waivers.

**(10)** The Attorney General's quotation from a case in 1992 that states that EOIR is a creature of regulation is misleading because, while this was true in 1992, it was no longer true when the Attorney General issued *Matter of Castro-Tum*. In enacting The Homeland Security Act of 2002, Congress removed the Attorney General's ability to dissolve EOIR or otherwise blindly dictate its every objective by passing 6 U.S.C. § 521. As such, EOIR is a creature of statute rather than regulation. This is important because the Attorney General is operating as if he has all the same powers he did over EOIR when the

Attorney General created EOIR as a matter of administrative convenience in the 1980s; the Attorney General's power over EOIR is now limited to the powers provided by 8 U.S.C. § 1103(g). Moreover, because the Attorney General has promulgated a wide variety of regulations which govern EOIR, the Attorney General cannot now limit those regulations by agency adjudication simply because he finds doing so expedient and more politically desirable.[57]

---

[57] For whatever it is worth, it is unlikely that the specific Attorney General who issued *Matter of Castro-Tum* (prior Attorney General, Jefferson Sessions III) would have been able to remain in office long enough to get through the informal rulemaking process had he tried to promulgate the rules announced in *Castro-Tum* through legislative rulemaking, as would have been proper. As such, the fact that agency adjudications are extremely expedient provide the main basis for the Attorney General's decision to promulgate the rules announced in *Castro-Tum* by agency adjudication instead of through legislative rulemaking. All other reasons provided by the Attorney General are pretextual.

The fact is, in May 2018 when *Castro-Tum* was issued, prior Attorney General Sessions was uncertain about how long he'd remain in the office of Attorney General due to ongoing public squabbles between himself and President Trump. *See, e.g.*, Tribune News Service, *Jeff Sessions Fires Back After Trump Tweets About His Russia Investigation Recusal*, L.A. TIMES (May 23, 2020), https://www.latimes.com/politics/story/2020-05-23/jeff-sessions-trump-russia-investigation (last visited May 28, 2020) (this article was distributed just 5 days after Attorney General Sessions issued *Matter of Castro-Tum*).

**Mr. Sessions abused the power of his office while he still could by using his referral and review power to make legal immigration more difficult in order to further his own personal biased agenda.** *See generally A Session in Hate*, AMERICA'S VOICE (originally published June 2017; last updated Jan. 3, 2019), https://americasvoice.org/sessionsinhate/

**(11)** Plaintiffs have demonstrated, using statistics from EOIR and DHS, that allowing an individual to administratively close their removal proceedings so that they may apply for a provisional unlawful presence waiver and then consular process abroad results in a total resolution of the immigration case and is faster than is the average non-detained removal proceeding in the Fort Snelling, Minnesota immigration court by a factor of at least 2, and possibly as high as 2.5. *Supra* ¶¶ 186-228. As such, the Attorney General's statement that administrative closure is counterintuitive to the timely adjudication and completion of removal cases is patently and objectively incorrect.

**(12)** The Attorney General's concern with indeterminate suspensions of removal cases which result from decisions to administratively close removal proceedings is an irrelevant red herring. If this were not true, it would be impossible for EOIR to indefinitely postpone removal hearings in light of the COVID-19 pandemic. Likewise, when a removal proceeding changes venue, the case is often in limbo for

("Jeff Sessions, former  Senator from Alabama and former U.S. Attorney General under Donald Trump,  has long been one of the nation's loudest anti-immigrant voices. When he was in the Senate, Sessions took every opportunity to denounce immigrants in incendiary terms and oppose immigration reform legislation. He had a record of making remarks against African-Americans that were so racist it cost him a federal judgeship.").

months with no set hearing date (i.e., an indefinite suspension
occurs). As Plaintiffs have shown, the status docket is also a form of
indefinite suspension, albeit with minimal reporting requirements. If
administratively closing the case resolves the removal proceedings
more quickly, more efficiently, and more fairly than would full blown
removal proceedings, the amount of time that a case remains
administratively closed for is simply irrelevant because, regardless of
the indeterminate length, a full and final resolution is still reached
more quickly than is possible in removal proceedings. The Attorney
General's decision in *Matter of Castro-Tum* uses legal gymnastics to
finesse this point into obscurity.

**(13)** It is somewhat comical, and extremely disconcerting, to see the
Attorney General argue that "no reasonable interpretation" of the
broad regulations at issue, which delegate the vast majority of the
Attorney General's authority to EOIR, can possibly conclude that
such regulations implicitly grant EOIR the authority to
administratively close cases for good cause. As far back as 1819, the
Supreme Court has interpreted the Constitution's "necessary and
proper" clause as being an elastic enlargement, and not a constriction,
of the powers expressly granted to Congress. *See M'Culloch v. State*,
17 U.S. 316, 324-25, 4 L. Ed. 579 (1819) ("Necessarily, powers must

here intend such powers as are suitable and fitted to the object; such as are best and most useful in relation to the end proposed. If this be not so, and if congress could use no means but such as were absolutely indispensable to the existence of a granted power, the government would hardly exist; at least, it would be wholly inadequate to the purposes of its formation."). Considering that the term "necessary," within the context of broad delegations of authority made by written legislation, has been construed since at least 1819 to mean "suitable and fitted to the object," the Attorney General's argument in *Castro-Tum* that no conceivable interpretation of "adequate and necessary" could include the implied power to administratively close removal proceedings—in situations in which administrative closure would be suitable and fitted to the object of concluding removal proceedings in as fair and timely a manner as possible—is absurd.

**(14)** The Attorney General contends that reading in implied powers into any of the relevant regulations would make other regulations which explicitly allow for certain actions superfluous. In so stating, the Attorney General promotes the canon of statutory interpretation relating to superfluous language from a guidepost governing interpretation of texts to the unyielding law of the land. It is well-

known that statutes and regulations often contain superfluous

language. The fact that one interpretation might make a separate

provision superfluous is not proof that the first interpretation is

invalid, but merely operates as a consideration that bears on the

interpretation of the text at issue. Said simply, the existence of a

regulation which expressly allows an immigration judge to grant a

continuance is not rendered superfluous by a related broad regulation

which expressly grants an immigration judge the authority to take all

adequate and necessary steps to resolve a case in a timely and

appropriate manner in accordance with their statutory and

regulatory authority. Tangentially, it is strange that the Attorney

General would compare a continuance to administrative closure

because a continuance *necessarily* prolongs the proceedings whereas

administrative closure, when granted to pursue collateral relief

outside of removal proceedings, is capable of and often does act to

decrease the overall time that elapses between commencement of

proceedings and the final conclusion of removal proceedings. This is

especially true in Plaintiffs' case because Plaintiffs have shown that

their removal proceedings would conclude more expeditiously if they

were allowed to administratively close their removal proceedings to

request collateral relief in the form of a provisional unlawful presence

waiver.

**(15)** The Attorney General's conclusion that there would be no need for certain regulations to provide that administrative closure is available if it were inherently a power granted to EOIR adjudicators misses the mark. By providing in a regulation that administrative closure is allowable in a specific circumstance, the regulation simply acts to inform the 'good cause' analysis that the adjudicator must work through when deciding whether to grant a motion for administrative closure. Providing, by regulation, that administrative closure may be available informs the judge that good cause for administrative closure likely exists if certain facts are proven and likely does not exist if those facts are lacking. This does not mean that administrative closure is never proper in other areas, though, so long as the adjudicator can determine whether good cause for administrative closure exists despite the lack of an explicit regulatory framework governing such determinations.

**(16)** Plaintiffs agree that there is a strong public interest in ending removal proceedings as promptly as possible. As Plaintiffs have shown that administratively closing removal proceedings to allow an individual to apply for a provisional unlawful presence waiver aids the interests of promptly ending removal proceedings, Plaintiffs

simply demur from the Attorney General's contention that administrative closure, for the purpose of applying for a provisional unlawful presence waiver, prolongs removal proceedings and hurts the interests of timely completion.

**(17)** Allowing a noncitizen in removal proceedings to administratively close their removal proceedings in order to apply for a provisional unlawful presence waiver is not a situation in which the delay hurts the government (assuming for the sake of argument that this series of events causes a delay). Plaintiffs have shown that each administrative closure granted for this purpose saves the government roughly $168 if the individual would instead apply for non-LPR cancellation of removal in removal proceedings. Plaintiffs have also shown that DHS is able to adjudicate applications for provisional unlawful presence waivers more efficiently than EOIR is able to adjudicate removal proceedings.[58] Moreover, if DHS does not believe

---

[58] It may also be relevant that USCIS, a component of DHS, recently announced that it requires a 1.2-billion-dollar bailout to avoid furloughing employees and taking other drastic actions. *See, e.g.*, Hamed Aleaziz, *The US Agency in Charge of The Immigration System Says It's Facing A Financial Disaster Amid the Coronavirus Pandemic*, BUZZFEED NEWS (May 19, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/coronavirus-uscis-budget (**"'Without congressional intervention, we risk not being able to make payroll and will have to take drastic actions to keep the agency afloat,' the leader of the US Citizenship and Immigration Services wrote to employees."**) (emphasis added). Considering that

the individual should be removed without being granted a waiver of inadmissibility, DHS can simply deny the waiver request and force the noncitizen to seek relief in removal proceedings. Conversely, the Attorney General argued that delay can also work harm to noncitizens if the delay causes them to gain lawful permanent resident status more slowly than would otherwise be possible. While this is true, the Attorney General's decision is the cause of undue delay for noncitizens who could apply for a provisional unlawful presence waiver and consular process into the United States as lawful permanent residents if only they were allowed to administratively close their removal proceedings.

**(18)** Congress has amended the Immigration and Nationality Act on a great many occasions since the first instance of administrative closure being used in removal proceedings. Congress is presumed to be aware of the fact that removal proceedings were being administratively closed. Not once in 40 years did Congress pass a statute which restricted the ability of immigration courts to

---

USCIS requires fees to support itself, any policy which forces EOIR to waste resources conducting removal proceedings for persons who could apply for collateral benefits with USCIS hurts all parties involved, including noncitizens, the spouses and children of noncitizens, USCIS, DHS, EOIR, and the United States.

administratively close removal proceedings; not once in 40 years did the Attorney General promulgate a regulation which restricted the ability of immigration courts to administratively close removal proceedings. Over the years, countless courts of appeals, and even the Board of Immigration Appeals have acted as if the power to administratively close removal proceedings is an implied power under the INA and related regulations. To the best of Plaintiffs' knowledge, no court has ever ruled that administrative closure is ultra vires, nor do Plaintiffs believe any court would ever make such a finding if it was a noncitizen, rather than DHS, which challenged the agency's power to administratively close removal proceedings (this could happen if DHS wanted to administratively close a case as an exercise of prosecutorial discretion while the noncitizen wanted to pursue cancellation of removal, or some other type of relief, instead). **To date, prior Attorney General Jefferson Sessions III is the only individual in the United States who has ever reached the quizzical conclusion that EOIR is <u>not</u> given the implied power, through regulatory language, to administratively close removal proceedings upon a showing of good cause.**

**(19)** The Attorney General's statement—stating that regulations already expressly authorize other mechanisms that serve the same

functions, and those other mechanisms avoid many of the drawbacks
of administrative closure—is incorrect. No regulation already
expressly authorizes other mechanisms that serve the same functions
as administrative closure because no other mechanism expressly
authorized by regulation allows an individual in removal proceedings
to apply for a provisional unlawful presence waiver. *See* 8 C.F.R. §
212.7(e)(4)(iii). The Attorney General understood this, but simply
ignored the fact that individuals who seek to apply for provisional
unlawful presence waivers cannot avail themselves of any other
mechanism expressly authorized by regulation. This sort of willful
blindness on the part of the Attorney General would not work well in
the context of legislative rulemaking subject to notice-and-comment,
which is one of the reasons underlying the Attorney General's decision
to skirt the requirements of 5 U.S.C. § 553. *See also supra*, 138 n.57.

**(20)** The Attorney General inflated the total number of
administratively closed cases that existed at the end of FY 2017. He
provided that "statistics maintained by EOIR show that at the end of
Fiscal Year 2017, some 355,835 administratively closed cases had yet
to be recalendared" despite the fact that statistics received from EOIR
show that, at the end of FY 2017, only 339,464 cases were
administratively closed. *Supra* ¶¶ 212, 213.

423.  Thus, using the analytical framework of *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, Plaintiffs have shown that the Attorney General's stated reasons for issuing *Matter of Castro-Tum* are inadequate, insufficient, and incapable of supporting the Attorney General's *Castro-Tum* decision. *See* 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983).

424.  Because the Attorney General's stated reasons for promulgating the rules announced *Matter of Castro-Tum* are incapable of supporting the Attorney General's decision (at least with respect to motions to administratively close proceedings filed for the sole purpose of applying for a provisional unlawful presence waiver with DHS), EOIR Defendants have erred in a manner that has prejudiced Plaintiffs by relying on *Matter of Castro-Tum* as the sole justification for denying Plaintiffs' motions to administratively close their removal proceedings in order to become eligible to apply for a provisional unlawful presence waiver with DHS.

425.  Defendants' agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

426.  Defendants' agency action was contrary to constitutional right, power, privilege, or immunity.

427. Defendants' agency action was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

428. Defendants' agency action was without observance of procedure required by law.

429. Defendants' agency action was unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute.

430. Defendants' agency action was unwarranted by the facts to the extent that the facts are subject to trial de novo review by the reviewing court.

## Count 6: *Ex Parte Young*

431. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-430 *supra* and paragraphs, 447-503 *infra*.

432. The Attorney General's precedential *Matter of Castro-Tum* decision is beyond the Attorney General's statutory and regulatory authority and is thus ultra vires.

433. Because *Matter of Castro-Tum* is ultra vires, it cannot be relied upon by Defendants to deny Plaintiffs' motions to administratively close their removal proceedings.

434. Defendants have engaged in a pattern or practice of relying on *Castro-Tum* as the justification for denying Plaintiffs' motions to administratively close their removal proceedings despite *Matter of Castro-Tum* being the result of an ultra vires exercise of authority by the Attorney General.

435. Similarly, the Attorney General's *Matter of Castro-Tum* decision was in excess of statutory authority, and thus ultra vires, because the Attorney General's decision substantively bears on and limits the Secretary of Homeland Security's "sole discretion" to waive grounds of inadmissibility arising under 8 U.S.C. § 1182(a)(9)(B)(i).

436. Specifically, the Attorney General's issuance of *Matter of Castro-Tum* reinterpreted and limited 8 U.S.C. § 1182(a)(9)(B)(v)'s waiver to only be available for individuals not currently in removal proceedings *despite* the Secretary of Homeland Security's standing interpretation of 8 U.S.C. § 1182(a)(9)(B)(v) which holds that a provisional unlawful presence waiver under § 1182(a)(9)(B)(v) is available for individuals in removal proceedings. *See* 8 C.F.R. § 212.7(e)(4)(iii).

437. The Attorney General's *Matter of Castro-Tum* decision effectively amended the text of 8 C.F.R. § 212.7(e)(4)(iii), a regulation promulgated by the Secretary of Homeland Security, in a manner that

disallows any individual in removal proceedings from applying for provisional unlawful presence waivers.

438.   The conduct of the Attorney General, delineated in the previous paragraph, was ultra vires because the Attorney General does not have the authority to amend the Secretary's regulations by express action or by implication.

439.   The Attorney General violated 5 U.S.C. § 553 (the Administrative Procedure Act) on May 18, 2018 by promulgating substantive and legislative rules through an agency adjudication (*Matter of Castro-Tum*, 27 I. & N. Dec. 271) without following the rulemaking process mandated by statute; this makes the rules announced in *Matter of Castro-Tum* ultra vires and unenforceable.

440.   Because ultra vires actions are inherently unlawful, it was also unlawful for EOIR Defendants to rely on *Matter of Castro-Tum* to deny Plaintiffs' motions to administratively close their proceedings.

441.   Defendants' agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

442.   Defendants' agency action was contrary to constitutional right, power, privilege, or immunity.

443.   Defendants' agency action was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

444. Defendants' agency action was without observance of procedure required by law.

445. Defendants' agency action was unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute.

446. Defendants' agency action was unwarranted by the facts to the extent that the facts are subject to trial de novo review by the reviewing court.

## **Count 7: Administrative Procedure Act – Rulemaking**

447. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-446 *supra* and paragraphs, 456-503 *infra.*

448. The Secretary of Homeland Security violated 5 U.S.C. § 553 (the Administrative Procedure Act) by adopting a binding policy (constituting a de facto regulation) which functionally amended 8 C.F.R. § 212.7(e)(4)(iii) to prevent all individuals in removal proceedings from applying for a provisional unlawful presence waiver without complying with the rulemaking or adjudication procedures of 5 U.S.C. §§ 553 or 554.

449. The binding policy adopted by the Secretary is one that rejects all applications for provisional unlawful presence waivers filed by

individuals in removal proceedings despite the fact that such

individuals are no longer eligible to administratively close their

removal proceedings.

450. Defendant's agency action was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.

451. Defendant's agency action was contrary to constitutional right, power,

privilege, or immunity.

452. Defendant's agency action was in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right.

453. Defendant's agency action was without observance of procedure

required by law.

454. Defendant's agency action was unsupported by substantial evidence in

a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the

record of an agency hearing provided by statute.

455. Defendant's agency action was unwarranted by the facts to the extent

that the facts are subject to trial de novo review by the reviewing

court.

## Count 8: Administrative Procedure Act – Pattern or Practices

456. Plaintiffs reallege and incorporate by reference, as if fully set forth

herein, the allegations in paragraphs 1-455 *supra* and paragraphs,

465-503 *infra.*

457.   The Secretary of Homeland Security has adopted an unlawful pattern or practice of discriminating against, and denying due process and equal protection of the law to, individuals in removal proceedings who wish to apply for provisional unlawful presence waivers and who would be eligible to apply for such waivers if only their removal proceedings were terminated or administratively closed.

458.   The regulations promulgated by the Secretary explicitly allow for individuals who have been ordered removed to apply for provisional unlawful presence waivers if they request advance permission in accordance with 8 U.S.C. § 1182(a)(9)(A)(iii) and 8 C.F.R. § 212.2(j), but for some reason, individuals without final orders of removal who are in removal proceedings are disallowed from applying for provisional unlawful presence waivers. There is no conceivable rational basis for this sort of discrimination and, although the Secretary may not have caused the problem created by *Castro-Tum*, the Secretary's refusal to do anything to remedy this issue has risen to the level of discrimination over time. It has been two years since *Castro-Tum* was issued, and the Secretary's failure to address the discriminatory impact of *Castro-Tum* has prejudiced Plaintiffs.

459.   Defendant's agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

460.   Defendant's agency action was contrary to constitutional right, power, privilege, or immunity.

461.   Defendant's agency action was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

462.   Defendant's agency action was without observance of procedure required by law.

463.   Defendant's agency action was unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute.

464.   Defendant's agency action was unwarranted by the facts to the extent that the facts are subject to trial de novo review by the reviewing court.

## Count 9: Administrative Procedure Act – Statutory Authority

465.   Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-464 *supra* and paragraphs, 480-503 *infra*.

466.   The Secretary of Homeland Security acted in excess of statutory authority—granted to the Secretary by 8 U.S.C. § 1182(a)(9)(B)(v) and, *inter alia*, 6 U.S.C. § 557—by promulgating 8 C.F.R. § 212.7(e)(4)(iii).

467. In 8 C.F.R. § 212.7(e)(4)(iii), the Secretary issued a rule that, in light of *Matter of Castro-Tum*, now operates to deny the right to apply for provisional unlawful presence waivers under 8 C.F.R. § 212.7(e) to all individuals in removal proceedings.

468. If the Attorney General is correct about EOIR lacking the inherent power to administratively close removal proceedings, then the Secretary's promulgation of a regulation that requires administrative closure is necessarily unreasonable and an abuse of the Secretary's discretion.

469. The language of 8 U.S.C. § 1182(a)(9)(B)(v) makes no distinction as to who is eligible for these waivers of inadmissibility, and it is unreasonable for the Secretary to interpret this statute in a manner that denies all individuals in removal proceedings from being eligible to apply for the waiver.

470. 8 C.F.R. § 212.7(e)(1) was also promulgated in excess of statutory jurisdiction, authority, or limitations and constitutes a plainly erroneous interpretation of INA § 212(a)(9)(B)(v), 8 U.S.C. § 1182(a)(9)(B)(v).

471. 8 U.S.C. § 1182(a)(9)(B)(v) provides the Attorney General (i.e., the Secretary of Homeland Security) with the sole discretion to waive grounds of inadmissibility arising under 8 U.S.C. § 1182(a)(9)(B)(i).

However, the statute does *not* give the Secretary the ability to refuse to engage in a discretionary analysis when deciding whether to waive grounds of inadmissibility arising under 8 U.S.C. § 1182(a)(9)(B)(i) simply because the applicant is in removal proceedings.

472.   Thus, the Secretary acted in excess of statutory authority by confining jurisdiction to adjudicate applications for provisional unlawful presence waivers to USCIS through the promulgation of 8 C.F.R. § 212.7(e)(1); jurisdiction over the adjudication of these waivers must be shared with EOIR in order to prevent unlawful discrimination against individuals in removal proceedings.

473.   It is inconceivable that Congress intended for persons who were ordered removed to be able to apply for a provisional unlawful presence waiver and also intended that individuals in removal proceedings who do not have a final order of removal should be ineligible to apply for the very same waiver. Such a policy cannot conceivably further any rational policy objective.

474.   Defendant's agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

475.   Defendant's agency action was contrary to constitutional right, power, privilege, or immunity.

476.  Defendant's agency action was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

477.  Defendant's agency action was without observance of procedure required by law.

478.  Defendant's agency action was unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557 or otherwise reviewed on the record of an agency hearing provided by statute.

479.  Defendant's agency action was unwarranted by the facts to the extent that the facts are subject to trial de novo review by the reviewing court.

## **Count 10: Mandamus**

480.  Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-479 *supra* and paragraphs, 487-503 *infra*.

481.  The Secretary's refusal to publish a proposed regulation to amend 8 C.F.R. § 212.7(e)(4)(iii) for a period for more than two years since the issuance of *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018) constitutes agency action unlawfully withheld or unreasonably delayed under the Administrative Procedure Act and 28 U.S.C. § 1361.

482.  The Secretary of Homeland Security is fully aware of *Matter of Castro-Tum*, and he or his delegates have instructed a component of the

Department of Homeland Security (i.e., Immigration and Customs Enforcement, or "ICE") to aggressively file motions to recalendar all removal proceedings that have been administratively closed; this is how the Secretary is taking advantage of the downtime imposed by the COVID-19 pandemic which has shut EOIR for non-detained matters through and including June 26, 2020.

483. By refusing to promulgate a proposed regulation to amend 8 C.F.R. § 212.7(e)(4)(iii) while simultaneously instructing DHS attorneys to file motions to recalendar all administratively closed proceedings, the Secretary appears to be constructing a discriminatory system designed to subtly make all individuals in removal proceedings ineligible to apply for provisional unlawful presence waivers.

484. It is fine if the Secretary wants to do this, but he must do so by informal rulemaking.

485. If the Secretary intends to amend 8 C.F.R. § 212.7(e) to make individuals in removal proceedings wholly ineligible to apply for provisional unlawful presence waivers, he needs to amend 8 C.F.R. § 212.7(e)(4)(iii) to make that clear.

486. Alternatively, if the Secretary believes that individuals in removal proceedings should be allowed to apply for provisional unlawful presence waivers, he must engage in informal rulemaking to edit 8

C.F.R. § 212.7(e)(4)(iii) in response to the Attorney General's issuance

of *Matter of Castro-Tum*.

## Count 11: Due Process

487.  Plaintiffs reallege and incorporate by reference, as if fully set forth

herein, the allegations in paragraphs 1-486 *supra* and paragraphs,

498-503 *infra.*

488.  Defendants' actions in denying Plaintiffs' motions to administratively

close proceedings violates the Due Process Clause of the Fifth

Amendment of the United States Constitution because such action

constitutes a denial of procedural due process by depriving Plaintiffs

of the right to submit applications for provisional unlawful presence

waivers. The sole basis for this deprivation turns on whether or not

Plaintiffs are in removal proceedings that are administratively closed.

489.  There are hundreds of thousands of individuals whose removal

proceedings were administratively closed prior to the Attorney

General's *Matter of Castro-Tum* decision and whose proceedings have

not yet been recalendared.

490.  The individuals mentioned in the preceding paragraph are eligible to

apply for provisional unlawful presence waivers; conversely

individuals who are in proceedings that were not administratively

closed prior to the issuance of *Matter of Castro-Tum* cannot apply for

the same relief, nor can individuals whose removal proceedings were administratively closed prior to *Castro-Tum* but recalendared before the individual submitted an application for a provisional unlawful presence waiver.

491. In both circumstances (i.e., those discussed in ¶¶ 489-90), the noncitizen is in removal proceedings.

492. No other meaningful distinction exists among persons (i.e., those discussed in ¶¶ 489-90) who are currently eligible to apply for a provisional unlawful presence waiver and persons who are ineligible to apply for a provisional unlawful presence waiver. This is the definition of an arbitrary and capricious exercise of authority.

493. By refusing to allow immigration judges to administratively close removal proceedings on a discretionary basis, Defendants have denied Plaintiffs the opportunity to present <u>reasons</u> why administrative closure should not be denied.

494. By removing immigration judges' authority to administratively close cases on a discretionary basis, Defendants have denied Plaintiffs the opportunity to present <u>evidence</u> of why administrative closure should be granted.

495. By removing immigration judges' authority to administratively close cases on a discretionary basis, Defendants have denied Plaintiffs the

opportunity to present evidence of why they are deserving of a

provisional waiver of unlawful presence.

496.   By removing immigration judges' authority to administratively close

cases on a discretionary basis, Defendants have denied Plaintiffs the

opportunity to present evidence of why they are deserving of consular

processing into the United States with the status of a lawful

permanent resident.

497.   By removing immigration judges' authority to administratively close

cases on a discretionary basis, Defendants have denied Plaintiffs an

unbiased tribunal.

## **Count 12: Equal Protection**

498.   Plaintiffs reallege and incorporate by reference, as if fully set forth

herein, the allegations in paragraphs 1-497 *supra*.

499.   Defendants' actions in denying Plaintiffs' motions to administratively

close proceedings violates the Equal Protection Clause of the Fifth

Amendment of the United States Constitution because such action

discriminates against Plaintiffs by making them ineligible to apply for

provisional unlawful presence waivers based on nothing more than

the fact that Plaintiffs happen to be in removal proceedings which are

not administratively closed.

500.    There are hundreds of thousands of individuals whose proceedings
        were administratively closed prior to the Attorney General's *Matter of
        Castro-Tum* decision and whose proceedings have not yet been
        recalendared.

501.    All of these individuals are eligible to apply for provisional unlawful
        presence waiver even though they're in removal proceedings, but
        Plaintiffs are arbitrarily denied this right because they're in removal
        proceedings.

502.    If Plaintiffs had previously been ordered removed, meaning that their
        removal proceedings are complete, they would be eligible to apply for a
        provisional unlawful presence waiver if they first complied with the
        statutes and regulations of 8 U.S.C. § 1182(a)(9)(A)(iii) and 8 C.F.R. §
        212.2(j).

503.    However, because Plaintiffs have not yet been ordered removed (and
        are thus less culpable than individuals who: (a) have been ordered
        removed but who did not depart the United States; or (b) unlawfully
        reentered the United States unlawfully after being removed),
        Plaintiffs are disallowed from applying for a provisional unlawful
        presence waiver. This is entirely nonsensical, discriminatory, and
        such a policy does not further any legitimate governmental interest.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.   Accept jurisdiction and subject Defendants' actions to judicial review;

B.   Grant declaratory relief including, but not limited to, a declaration that Defendant'(s) action(s) violated Plaintiffs constitutional rights;

C.   Hold unlawful and set aside Defendant EOIR's actions which denied Plaintiffs' motions to administratively close removal proceedings;

D.   Compel Defendant EOIR to grant Plaintiffs' motions to administratively close removal proceedings;

E.   Hold unlawful and set aside the Attorney General's *Matter of Castro-Tum* precedential decision;

F.   Hold unlawful and set aside 8 C.F.R. § 212.7(e)(1);

G.   Hold unlawful and set aside 8 C.F.R. § 212.7(e)(4)(iii);

H.   Declare that Defendants' actions are unlawful, a violation of the Immigration and Nationality Act and the relevant regulations, a violation of the Administrative Procedure Act, and a violation of the United States Constitution;

I.   Permanently enjoin EOIR Defendants from denying the motions to administratively close proceedings filed by Plaintiffs;

J.      Permanently enjoin EOIR Defendants from relying on *Matter of Castro-Tum* as justification for denying any motion to administratively close removal proceedings filed by class members;

K.      Declare that 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) <u>unambiguously</u> confer upon immigration judges and the Board of Immigration Appeals the general authority to administratively close cases for good cause unless such action is explicitly proscribed by statute or regulation;

L.      Order the Secretary of Homeland Security to promulgate a proposed regulation to amend 8 C.F.R. § 212.7(e)(1);

M.     Order the Secretary of Homeland Security to promulgate a proposed regulation to amend 8 C.F.R. § 212.7(e)(4)(iii);

N.      Certify the class described in this Complaint;

O.      Appoint Nico Ratkowski as class counsel under Fed. R. Civ. P. 23(g);

P.      Grant Plaintiffs an award of reasonable expenses in this litigation including reasonable attorney fees and costs; and,

Q.      Grant such other relief as may be just and reasonable.

DATED: June 9, 2020            Respectfully submitted,

                                  /s/ *Nico Ratkowski*
                                  Nico Ratkowski
                                  MN Attorney ID: 0400413
                                  Contreras & Metelska, P.A.
                                  200 University Avenue W., STE 200
                                  Saint Paul, MN 55103
                                  P: (651) 771-0019

F: (651) 772-4300
nico@contrerasmetelska.com

*Attorney for Plaintiffs*

## **VERIFICATION OF COMPLAINT**

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the attorneys for Plaintiffs in this case.

2. That he affirms the truth of the contents thereof upon information and belief, and he believes same to be true, and he further states that the sources of this information and belief are documents provided to him by Plaintiffs and by Defendants.

DATED: June 9, 2020                    Respectfully submitted,

*/s/ Nico Ratkowski*
Nico Ratkowski
MN Attorney ID: 0400413
Contreras & Metelska, P.A.
200 University Avenue W.
STE 200
Saint Paul, MN 55103
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

*Attorney for Plaintiffs*